# 18-3226(L)

## 18-3474(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆

IN RE: APPLICATION OF ANTONIO DEL VALLE RUIZ
AND OTHERS FOR AN ORDER TO TAKE DISCOVERY FOR USE
IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT BRIEF AND SPECIAL APPENDIX
## FOR PETITIONERS-APPELLANTS

---

PETER EVAN CALAMARI
DAVID MADER
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for the PIMCO
  and Anchorage
  Petitioners-Appellants*

JAVIER H. RUBINSTEIN, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000

C. HARKER RHODES IV
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC 20005
(202) 879-5000

LAUREN F. FRIEDMAN
LUCILA I.M. HEMMINGSEN
JOSEPH MYER SANDERSON
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Attorneys for the del Valle Ruiz
  Petitioners-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Petitioners-Appellants Consultores CGEK, S.C.; Fondo Administrado 5, S.A de C.V., Fondo de Inversion de Renta Variable; GBM Capital Bursatil, S.A. de C.V., Fondo de Inversion de Renta Variable; GBM Fondo de Inversion Total, S.A. de C.V., Fondo de Inversion de Renta Variable; GBM Global, S.A. de C.V., Fondo de Inversion de Renta Variable; Grow Investments S.A. de C.V.; Hechos con Amor, S.A. de C.V.; Inmobiliaria Asturval, S.A. de C.V.; and Simple Investments, S.A. de C.V. certify that each of them does not have a parent corporation and that no publicly held corporation owns more than ten percent of each of their stock.

Petitioner-Appellant BBVA Bancomer Servicios, S.A., Institucion de Banca Multiple, Grupo Financiero BBVA Bancomer, as trustee of Trust F/703850, certifies that at least 10% of its stock is owned by Banco Bilbao Vizcaya Argentaria, S.A., a publicly traded company.

Petitioner-Appellant Grupo Bursatil Mexicano, S.A. de C.V., Casa de Bolsa, as trustee of Trusts F/000138, F000139, F/101, and F/100, certifies that at least 10% of its stock is owned by Corporativo GBM, S.A.B. de C.V., a publicly-traded company.

Petitioner-Appellant Pacific Investment Management Company LLC, certifies that at least 10% of its stock is owned by Allianz SE, a publicly-traded company.

Petitioner-Appellant Anchorage Capital Group, L.L.C. certifies that it has no parent corporation and no publicly-traded company owns more than 10% of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ...............................................................................v

INTRODUCTION .............................................................................................1

JURISDICTIONAL STATEMENT ...................................................................5

STATEMENT OF THE ISSUES .......................................................................5

STATEMENT OF THE CASE ...........................................................................6

I.      The Parties and Other Relevant Entities ...............................................6

II.     Santander's Government-Ordered Acquisition of BPE .........................9

III.    The Foreign and International Proceedings ..........................................14

IV.     The District Court Proceedings ...........................................................17

SUMMARY OF ARGUMENT ........................................................................20

STANDARD OF REVIEW .............................................................................23

ARGUMENT ..................................................................................................23

I.      Santander Is "Found" in the Southern District of New York
        Under §1782 ........................................................................................23

        A.      A Person Is "Found" for Purposes of §1782 Wherever That
                Person Is Subject to Personal Jurisdiction ...............................25

        B.      Scores of Other Statutes Use "Found" in the Same Way ..........26

        C.      Under Any Plausible Standard, Santander Is "Found" in the
                Southern District of New York ..................................................32

        D.      Section 1782 Cannot Be Read to Require General
                Jurisdiction ...............................................................................34

II.     The District Court Had Specific Jurisdiction to Order Santander to
        Provide the Requested Discovery ........................................................35

A.     Specific Jurisdiction Reaches More Broadly in the Discovery Context than in the Liability Context .................................................37

B.     Under Any Standard, the District Court Had Specific Personal Jurisdiction Over Santander ...............................................................41

     1.     Santander Purposefully Availed Itself of the Privilege of Doing Business in New York, and the Requested Discovery Is Related to Its Activities in New York .................44

     2.     The District Court's Contrary Decision Misread Both the Facts and the Applicable Law..............................................48

     3.     Principles of Fair Play and Substantial Justice Support Requiring Santander to Provide the Requested Discovery.................................................................................54

CONCLUSION ....................................................................................57

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Andra Grp., LP v. BareWeb, Inc.*,
   No. 4:17-CV-00815, 2018 WL 2848985 (E.D. Tex. June 11, 2018) ................30

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
   305 F.3d 120 (2d Cir. 2002) ................................................................44, 51, 52

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
   673 F.3d 76 (2d Cir. 2012) ...........................................................24, 35, 37, 56

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
   137 S. Ct. 1773 (2017) ...............................................................................36, 39

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ..........................................................................42, 45, 54, 55

*Burnham v. Super. Ct. of Cal.*,
   495 U.S. 604 (1990) .........................................................................................26

*Cavu Releasing, LLC v. Fries*,
   419 F. Supp. 2d 388 (S.D.N.Y. 2005) ............................................................29

*Cayman Nat. Bank, Ltd. v. United States*,
   8:06-MC-50-T-24 MAP, 2007 WL 641176
   (M.D. Fla. Feb. 26, 2007) ................................................................................33

*Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*,
   798 F.3d 113 (2d Cir. 2015) ............................................................................18

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018) ..............................................................................50

*Chloé v. Queen Bee of Beverly Hills, LLC*,
   616 F.3d 158 (2d Cir. 2010) ..................................................................50, 51, 53

*Da Rocha v. Bell Helicopter Textron, Inc.*,
   451 F. Supp. 2d 1318 (S.D. Fla. 2006) ...........................................................40

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) .........................................................................34, 36, 50

v

*Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013) ..................................................23, 49

*Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.*,
    829 F. Supp. 62 (S.D.N.Y. 1993) ........................................29

*EMI Christian Music Grp. Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016) ....................................................23

*First Am. Corp. v. Price Waterhouse LLP*,
    154 F.3d 16 (2d Cir. 1998) ..............................................37, 43

*Gucci Am., Inc. v. Weixing Li*,
    135 F. Supp. 3d 87 (S.D.N.Y. 2015) ....................46, 47, 53, 54

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) ...........................................*passim*

*I.A.M. Nat. Pension Fund v. Wakefield Indus., Inc.*,
    699 F.2d 1254 (D.C. Cir. 1983) ...........................................28

*In re Accent Delight Int'l Ltd.*,
    869 F.3d 121 (2d Cir. 2017) ............................................5, 23

*In re Alghanim*,
    No. 17-mc-406, 2018 WL 2356660 (S.D.N.Y. May 9, 2018) .........44

*In re Application to Enforce Admin. Subpoenas of the SEC v.*
    *Knowles*, 87 F.3d 413 (10th Cir. 1996) ..............................42

*In re Edelman*,
    295 F.3d 171 (2d Cir. 2002) ...........................................*passim*

*In re Gianoli Aldunate*,
    3 F.3d 54 (2d Cir. 1993) .....................................................24

*In re Kleimar N.V.*,
    220 F. Supp. 3d 517 (S.D.N.Y. 2016) ..................................32

*In re Malev Hungarian Airlines*,
    964 F.2d 97 (2d Cir. 1992) .................................................24

*In re Republic of Kazakhstan,*
  110 F. Supp. 3d 512 (S.D.N.Y. 2015) ............................................................33

*In re Sargeant,*
  278 F. Supp. 3d 814 (S.D.N.Y. 2017) ............................................................19

*Int'l Shoe Co. v. Washington,*
  326 U.S. 310 (1945) .....................................................................39, 41, 42

*Intel Corp. v. Advanced Micro Devices, Inc.,*
  542 U.S. 241 (2004) ...........................................................................18, 23

*Licci v. Lebanese Canadian Bank,*
  732 F.3d 161 (2d Cir. 2013) .........................................................44, 52, 55

*McGraw-Hill Global Educ. Holdings, LLC v. Mathrani,*
  295 F. Supp. 3d 404 (S.D.N.Y. 2017) ............................................................50

*Mensh v. United States,*
  08-CV-4162 (DLI)(ALC), 2009 WL 2242295
  (E.D.N.Y. July 27, 2009) ............................................................................33

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.,*
  84 F.3d 560 (2d Cir. 1996) ........................................................................55

*Milliken v. Meyer,*
  311 U.S. 457 (1940) ..................................................................................39

*Nike, Inc. v. Wu,*
  13-CV-8012, 2018 WL 4907596 (S.D.N.Y. Sept. 25, 2018) ...........................47

*Ortiz v. Fibreboard Corp.,*
  527 U.S. 815 (1999) ..................................................................................39

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985) .............................................................................38, 39

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren,*
  361 F.3d 11 (1st Cir. 2004) ........................................................................40

*Ratliff v. Davis Polk & Wardwell,*
  354 F.3d 165 (2d Cir. 2003) ......................................................................54

*Rubin v. Islamic Republic of Iran,*
  138 S. Ct. 816 (2018) .......................................................34

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,*
  450 F.3d 100 (2d Cir. 2006) ...........................................52

*Sygall v. Pitsicalis,*
  No. 18-CV-2730 (VSB), 2018 WL 5981994
  (S.D.N.Y. Nov. 14, 2018) ...............................................30

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC,*
  137 S. Ct. 1514 (2017) ...............................................27, 30

*Thorburn v. Gates,*
  225 F. 613 (S.D.N.Y. 1915) ...........................................29

*Trs. of the Plumbers & Pipefitters Nat'l Pension Fund*
  *v. Plumbing Servs.,*
  791 F.3d 436 (4th Cir. 2015) .........................................36

*United States v. Sneeky Theef Records, Inc.,*
  526 F. Supp. 434 (N.D.N.Y. 1981 ..................................31

*United States v. Toyota Motor Corp.,*
  561 F. Supp. 354 (C.D. Cal. 1983) ...............................31

*Varsic v. U.S. District Court,*
  607 F.2d 245 (9th Cir. 1979) .........................................28

*Waeltz v. Delta Pilots Ret. Plan,*
  301 F.3d 804 (7th Cir. 2002) .........................................28

*Waldman v. PLO,*
  835 F.3d 317 (2d Cir. 2016) ...........................................36

*World-Wide Volkswagen Corp. v. Woodson,*
  444 U.S. 286 (1980) .................................................39, 55

**Statutes**

15 U.S.C. §15 ..................................................................28

15 U.S.C. §77v ...............................................................27

15 U.S.C. §78aa ................................................................................27

18 U.S.C. §1965 ................................................................................28

26 U.S.C. §7402 ...........................................................................31, 33

26 U.S.C. §7604 ...........................................................................31, 33

26 U.S.C. §7609 ...........................................................................31, 33

28 U.S.C. §1291 ..................................................................................5

28 U.S.C. §1331 ..................................................................................5

28 U.S.C. §1332 ................................................................................34

28 U.S.C. §1391 ................................................................................27

28 U.S.C. §1400 ...........................................................................29, 30

28 U.S.C. §1782 ..........................................................................*passim*

29 U.S.C. §1132 ................................................................................28

Act of June 25, 1948, ch. 646, 62 Stat. 949 ...................................25

Act of May 24, 1949, Pub. L. No. 81-72, 63 Stat. 89 .....................25

Act of Oct. 3, 1964, Pub. L. No 88-619, 78 Stat. 997 .....................26

Act of Sept. 24, 1789, 1 Stat. 79 .....................................................27

**Rules**

Fed. R. Civ. P. 26 ............................................................................54

Fed. R. Civ. P. 45 ............................................................................40

**Other Authorities**

Federal Judicial Center, *Discovery in International Civil Litigation:
    A Guide for Judges* (2015), *available at* 2015 WL 905619 ..............40

H.R. Rep. No. 81-352 (1949), *reprinted in* 1949 U.S.C.C.A.N. 1254 ...................25

S. Rep. No. 88-1580 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3782 ...............24, 26

Rhonda Wasserman, *The Subpoena Power: Pennoyer's Last Vestige*,
  74 Minn. L. Rev. 37 (1989)...................................................................38

**INTRODUCTION**

At the beginning of June 2017, Banco Popular Español, S.A. ("BPE") was Spain's sixth-largest bank, with total assets of some €147 billion.  On June 7, 2017, the European Union and the Spanish government forced BPE into resolution— making it the first financial institution in the European Union to undergo that procedure—and sold the entire bank to Banco Santander, S.A. ("Banco Santander") for the nominal price of €1.  That resolution and acquisition—arranged by regulators without any notice—wiped out over 300,000 BPE stockholders and bondholders, including Appellants, without giving them any opportunity to be heard or to pursue alternative transactions that would have averted the resolution.

The del Valle Ruiz Appellants and Anchorage Appellants filed legal challenges to the BPE resolution in the Court of Justice of the European Union.  In addition, the del Valle Ruiz Appellants brought international arbitration proceedings against the Kingdom of Spain under the Mexico-Spain Bilateral Investment Treaty, and the PIMCO and Anchorage Appellants filed writs to join as aggrieved parties in Spanish criminal proceedings against BPE.  All of these proceedings are still pending.  In support of those proceedings, Appellants filed applications for discovery in the district court below, seeking to obtain critical evidence from Banco Santander and its subsidiaries Santander Holdings U.S.A. Inc. ("Santander

Holdings"), Santander Bank, N.A. ("Santander Bank"), and Santander Investment Securities Inc. ("SIS"), regarding the BPE resolution and acquisition.

The statute on which Appellants relied in seeking the requested discovery, 28 U.S.C. §1782, was enacted by Congress to provide a straightforward and effective mechanism for litigants in foreign or international proceedings to obtain discovery in United States courts. Under that statute, a federal district court has the authority to order a person who "resides or is found" in its district to produce discovery for use before a foreign or international tribunal. 28 U.S.C. §1782(a). Relying on that statute, Appellants asked the district court to order Santander to produce documents related to the BPE resolution and acquisition that would materially aid the adjudication of Appellants' claims in the foreign proceedings— documents that the district court recognized were "currently beyond the reach of the foreign tribunals." SPA-16.

The district court granted the application with respect to SIS but denied the applications against Banco Santander, Santander Holdings, and Santander Bank (collectively "Santander"). Despite recognizing that Santander has a significant presence in the Southern District of New York—including, among other things, that it operates branch offices in the district, manages $25.2 billion in assets in New York, is listed on the New York Stock Exchange, and is supervised by the New York State Department of Financial Services—the district court nevertheless held that

Santander is not "found" in the district under §1782, because (according to the district court) Santander is not subject to personal jurisdiction there for purposes of Appellants' applications for discovery.

That conclusion was wrong both as a statutory matter and as a constitutional matter. Under the statute, Santander is "found" in New York for purposes of §1782 by any plausible interpretation of that term. As this Court indicated in *In re Edelman*, 295 F.3d 171 (2d Cir. 2002), and as the caselaw interpreting similar "found" provisions in other statutes reinforces, that term requires only the minimum contacts necessary for personal jurisdiction—a threshold that Santander easily meets. Even if the statute imposed a higher threshold, such as continuous and systematic contacts with the district or a physical presence in the district, Santander would meet that heightened threshold as well, given that it has operated branch offices in the district for decades and handles billions of deposits there. Contrary to Santander's position below, §1782 cannot be read to go even further and require *general* jurisdiction in the district over the respondent; that not only would essentially read the term "found" out of the statute, but also would conflict with the consistent interpretation of that same language in other statutes and with Congress's clear intent.

The district court was equally wrong to conclude that it lacked personal jurisdiction over Santander for purposes of these §1782 applications. Even assuming that the district court lacked *general* personal jurisdiction over Santander, it still had

*specific* personal jurisdiction to order the requested discovery. As an initial matter, because Appellants seek only to obtain discovery from Santander—not to impose damages or otherwise force Santander to defend its past actions—due process permits a broader jurisdictional reach here than in the liability context. But even under the narrower test for specific jurisdiction in the liability context, Santander still is subject to specific jurisdiction in the Southern District of New York for discovery relating to the BPE resolution and acquisition. Santander engaged in numerous activities in New York, both before and after the BPE resolution, that were directly related to the BPE transaction and that easily provide a sufficient basis for specific jurisdiction here. Before the resolution, for instance, Santander hired and worked with New York financial advisors and legal counsel to prepare for its acquisition of BPE—activities that the district court simply ignored. And after the resolution, Santander conducted investor "road show" meetings in New York and launched a securities offering in New York as part of a €7 billion capital raise to fund the transaction—activities that the district court excluded from its analysis solely because they occurred just after the BPE resolution and acquisition, even though they unquestionably were related to the BPE transaction (and indeed, the BPE transaction could not have taken place without them). In light of those extensive activities in New York, the district court erred as a matter of law in finding that it lacked specific jurisdiction over Santander for purposes of these §1782

applications. This Court should vacate the decision below and remand for the district court to grant the requested discovery.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §1331 and §1782. It entered its final order denying the del Valle Ruiz Appellants' application and denying in part the PIMCO and Anchorage Appellants' application for discovery under §1782 on October 19, 2018. SPA-1–18. The del Valle Ruiz Appellants filed their timely notice of appeal on October 25, 2018. A-1614. The PIMCO and Anchorage Appellants timely filed their notice of appeal on November 19, 2018. A-3336. This Court ordered consolidation of the appeals on November 30, 2018. This Court has appellate jurisdiction under 28 U.S.C. §1291. *See, e.g.*, *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017).

## STATEMENT OF THE ISSUES

1. Whether Santander—which maintains physical branch offices in New York, manages $25.2 billion in assets in New York, is listed on the New York Stock Exchange, is supervised by the New York State Department of Financial Services, took several preparatory steps in New York in advance of its acquisition of BPE, and carried out a €7 billion capital raise including a securities offering in New York to finance that transaction—is "found" in the Southern District of New York for purposes of 28 U.S.C. §1782.

2.     Whether, in light of the substantial contacts between Santander and New York and their relation to the underlying dispute, Santander is subject to personal jurisdiction in the Southern District of New York for purposes of discovery relating to the BPE resolution and acquisition.

## STATEMENT OF THE CASE

These consolidated appeals arise from a decision entered in the U.S. District Court for the Southern District of New York (Ramos, J.) denying the del Valle Ruiz Appellants' application and denying in part the PIMCO and Anchorage Appellants' application for discovery under §1782. SPA-1–18. That decision is not yet reported.

## I.     The Parties and Other Relevant Entities

*Appellants*.  The del Valle Ruiz Appellants in No. 18-3226 are a group of 55 Mexican nationals who collectively invested more than €470 million (approximately $577 million at current exchange rates) in BPE shares and bonds.  A-56–57, 98, 198–200.  Appellants originally invested through a 2013 capital increase that BPE conducted exclusively for Appellants and other Mexican investors; thereafter, Appellants made further investments through market purchases and participation in a 2016 capital increase.  A-98, 1449, 1454–55.  By June 2017, Appellants owned around 4.3% of BPE.  A-98, 1455, 1506–07.

Appellants in consolidated appeal No. 18-3474, Pacific Investment Management Company LLC ("PIMCO") and Anchorage Capital Group, L.L.C.

("Anchorage"), are U.S.-based investment and asset management firms that manage funds that previously held over €640 million ($800 million) of Tier 1 and Tier 2 bonds in BPE. SPA-2; A-1834–35.

*BPE.* BPE, founded in 1926, was Spain's sixth largest bank in June 2017, with €147 billion ($180 billion) in assets. A-103. It also had operations in a number of other countries, including its ownership of TotalBank, N.A. in the United States. A-105. Historically, BPE's core business consisted of a strong Spanish retail franchise, with a focus on lending credit to small and medium-sized enterprises. A-103. Beginning in the mid-2000s, mortgages and other home loans to retail customers became increasingly important to BPE's business operation. *Id.* The collapse of the housing sector during the 2008-2009 financial crisis revealed the European banking system's exposure to toxic and non-performing assets (NPAs). *Id.* Like many European banks, BPE had many NPAs, but was working to manage their impact on its balance sheet. *Id.*

Through capital increases—including the ones in which Appellants participated in 2016—and other prudent measures, BPE consistently passed all regulatory inspections and stress tests and complied with all regulatory requirements without any government assistance before 2017, unlike most banks in Spain. A-104, 407. A 2016 court ruling invalidating "floor clauses" (which limited interest rate reductions on variable rate mortgages) required BPE to set aside a €350 million

reserve.  A-104, 155.  Beginning in December 2016, numerous Spanish government entities began to make substantial deposit withdrawals from BPE, weakening the bank's liquidity position.  A-105, 581, 669, 696.

In April 2017, to stabilize the bank's financial position, and with shareholder approval, BPE executed or was in the process of executing: (i) a number of substantial asset sales, with key asset sales ready to be completed by early to mid-June 2017; (ii) a capital increase, with Deutsche Bank, Barclays Bank, PIMCO, and the del Valle Ruiz Appellants all prepared to invest more than enough capital to cover the planned increase; and (iii) a sale of the bank, in a process that was extended until the end of June 2017.  A-105–109, 414–83.  All of those efforts were suddenly terminated when the European Union and the Spanish government forced BPE into resolution.

*Santander.*  Banco Santander is one of the largest banks in the world.  A-99. It is the largest bank in Spain, and maintains substantial operations across the globe. *Id*.  In the United States, Banco Santander conducts business both directly and through wholly-owned subsidiaries.  Banco Santander has maintained a branch in New York since 1977, with its current location at 45 East 53rd Street in New York. A-99. That branch is regulated by the New York State Department of Financial Services and holds $25.2 billion in deposits.  A-278, 1846, 2362.  According to Federal Reserve filings, Banco Santander's New York branch has extended billions

8

of dollars in credit to other members of the Santander group, including its U.S. subsidiaries. A-99, 285. Banco Santander has also been listed on the New York Stock Exchange for more than thirty years through sponsored American Depositary Receipts, and has appointed its New York Branch at 45 East 53rd Street as its agent for service of process. A-100–01, 290, 327. Santander Bank—a subsidiary of Santander Holdings, which is in turn a subsidiary of Banco Santander—likewise maintains numerous branches in New York, including a branch at 45 East 53rd Street that it shares with Banco Santander. A-99–100. In addition, the CEO of Santander's operations in the United States, Scott Powell, appears to live and work in New York. A-100, 287. Taken as a whole, Banco Santander and its subsidiaries constitute the ninth largest banking group by deposit share in the New York City area. A-280.

## II.    Santander's Government-Ordered Acquisition of BPE

Prior to the resolution of BPE, Santander evaluated a private acquisition of the bank, and was widely reported to be interested in acquiring BPE. It accessed the virtual data room created by BPE and, according to one of its directors, completed its diligence for a potential bid. A-469. Santander retained UBS and a New York-based investment banking and financial services company as its financial advisors on the bid and, as of late May, was rumored to be preparing a bid of €3 billion. A-108, 469. To allow other bidders more time to prepare their bids, BPE's Board

announced that it was extending the bid window from June 10, 2017, to June 30, 2017.  A-108, 483.

In May 2017, BPE suffered from an increasing level of deposit withdrawals. After an article on May 11, 2017 speculating that BPE was selling itself due to "bankruptcy risk," over €1 billion in deposits were withdrawn in a single day.  A-110, 553.  As a result, BPE informed Spanish and European banking regulators that it would need liquidity assistance.  A-110.  The same day, the Spanish Minister of the Economy, Luis de Guindos, stated that although other banks had received liquidity assistance in the past, Spain was not envisioning granting any financial assistance to BPE.  A-110, 565–66.

On May 23, 2017, the Chairman of the European Union's Single Resolution Board (SRB), Elke König, publicly stated that BPE was being "observed" by the SRB.  A-462, 599, 601.  That led depositors to conclude that BPE was facing imminent resolution, which in turn led to even larger deposit withdrawals.  *Id.*  A week later, on May 31, 2017, a quote from Ms. König was leaked to Reuters, reportedly stating that BPE might need to be wound down should it fail to find a buyer.  A-110, 554, 571–74.  That same day, the SRB issued a press release in which it said it would "not comment on any bank-specific matters."  A-576.  BPE by then was facing an all-out run on the bank, with €5.2 billion withdrawn in the last two weeks of May.  A-426.

The run on deposits continued to accelerate during the first week of June, with approximately €14 billion in withdrawals during that week, including €3 billion withdrawn on June 5, 2017 alone.  A-426, 550–54.  On that day, BPE requested €9.5 billion in emergency liquidity assistance, reportedly backed by more than €50 billion in assets posted as collateral.  A-550, 601.  The Bank of Spain only provided €3.5 billion in emergency liquidity assistance, reflecting an unprecedented 90% discount against the collateral posted.  *Id.*

During that same week, Minister de Guindos met with Ana Botín, Santander's Executive Chair, at the Bilderberg Group's annual meeting in Chantilly, Virginia.  A-118, 756–57.  Meanwhile, Santander's CEO, José Antonio Álvarez Álvarez, was in New York to ring the New York Stock Exchange closing bell on June 1, 2017, in celebration of the 30-year anniversary of the date when Santander was first listed on the New York Stock Exchange (although the actual anniversary of its listing was almost two months later).  A-290.  Given the timing, there is good reason to infer that while Álvarez was in New York, he also discussed plans to acquire BPE and undertook other activity in support of the planned acquisition.

After Minister de Guindos returned from the United States, the Bank of Spain refused to provide any further liquidity assistance to BPE.  A-111, 235, 609.  On June 6, 2017, BPE's Board determined that it could not withstand the bank run and

would be unable to open its doors because of its lack of liquidity, and informed banking regulators of this fact. A-548–54.

Three days earlier, Spain's national bank resolution authority, the FROB, had launched a tender process for the sale of BPE. A-655–73. At that time, there was no finding that BPE was "failing or likely to fail," as required by the relevant regulations; nor was there any finding that other public or private sector alternatives were unavailable, also required by the relevant regulations. On June 4, the FROB invited five Spanish banks to sign non-disclosure agreements, providing them access the next day to a virtual data room. A-267–68, 684. On June 6, the FROB informed the five banks that bids were due at midnight that same day. A-682–90.

Santander, which had previously conducted diligence on a bid for BPE (including with the help of its New York-based financial advisor), was the only one of the five in a position to bid that quickly. A-116. BBVA, the second largest bank in Spain, wrote to the FROB complaining that it could not formulate a bid in such a short time, while expressing an interest in bidding if the timeline were extended and additional information was provided; however, the FROB refused BBVA's request. A-704. Santander reportedly had drafted two bids—one for €3 billion and one for €1. A-116–17, 475–76, 693–96. After learning it was the only bidder, it submitted the €1 bid. *Id.*

Santander's bid immediately was accepted by the FROB, and the FROB recommended to the SRB that Santander be declared the purchaser of BPE. A-256–71. Without any opportunity to be heard, over 300,000 BPE stockholders, including Appellants, were wiped out.

Santander quickly replaced BPE's management and Board, took control of BPE's business, and launched a €7 billion capital raise that included a securities offering in New York that used the services of the Bank of New York Mellon, Santander's depositary for its American Depositary Shares. A-327–54, 356. The U.S. registration statement for that securities offering was signed by the Managing Director of Banco Santander's New York branch as Santander's authorized representative in the United States. A-353. Santander also named its New York branch as its agent for service of process in connection with the offering, and submitted to the non-exclusive jurisdiction of state and federal courts in New York for any action arising out of or in connection with the offering. A-335, 344. The stated purpose of Santander's capital raise was to facilitate its acquisition of BPE and to help the merged entity meet regulatory capital thresholds. A-343, 357, 374. As Santander's Prospectus Supplement stated: "The purpose of the Capital Increase is to reinforce and optimize the Bank's equity structure to adequately cover the addition of BPE following the Acquisition. We intend to use the net proceeds from

the Offer for general corporate purposes in connection with the Acquisition." A-357.[1]

To sell that capital raise to investors, Santander's executive leadership held high-level "road show" meetings with analysts and investors in New York. A-296, 1551, 1580–81. Santander also tapped its longtime New York counsel for securities matters, Davis Polk & Wardwell LLP, to advise it in connection with the capital raise. A-307–25, 344. As part of their representation of Santander, Davis Polk lawyers in New York wrote letters to the SEC seeking exemptive relief from certain securities law requirements and drafted hundreds of pages of securities disclosures related to the securities offering that Santander undertook in New York. *Id.* Santander announced the successful completion of its €7 billion capital raise on July 27, 2017. A-369. Shortly thereafter, Santander held its 2017 Group Strategy Update meeting for analysts and investors, and attended by its Executive Chairman, CEO, and other executives, at the New York Stock Exchange. A-292–93.

## III.   The Foreign and International Proceedings

Faced with overnight losses of more than half a billion euros as a result of Santander's acquisition of BPE, Appellants commenced several actions against the SRB, the European Commission, BPE, and Spain. In August 2017, the del Valle

---

[1]   In connection with the resolution of BPE, Santander also became the owner of U.S.-based TotalBank N.A., which it later sold to Banco de Crédito e Inversiones for $528 million. A-1835, 1982, 2211–13.

Ruiz and Anchorage Appellants filed pending legal challenges in the Court of Justice of the European Union, seeking annulment of the BPE resolution on the ground that it violated European Union law and failed to meet the statutory requirements for resolution. A-146–96; 1636–733. Specifically, Appellants contend, among other things, that BPE was not "failing or likely to fail," because it was not insolvent but rather was suffering from a short-term liquidity crisis that was substantially caused by the SRB itself, and that should have been addressed through emergency liquidity assistance that the Bank of Spain inexplicably refused to provide. A-146–96, 1635–733. Second, Appellants contend that there were numerous private sector measures available that could have stabilized the bank's financial condition within a reasonable timeframe, and that should have averted the resolution, including a capital increase that Appellants and major international banks were prepared to achieve. A-146–96, 1635–733. Appellants also claim that the €1 purchase price was far below BPE's fair market value as of the date of resolution. A-146–96, 1635–733.

In January 2018, PIMCO and Anchorage filed writs with the Spanish Central Criminal Court to join, as aggrieved parties, Spanish criminal proceedings against BPE for breaching several articles of the Spanish Criminal Code, including false accounting and investment fraud in connection with its capital increases and acquisition by Santander. A-1737, 1740–65. As part of those proceedings, PIMCO

and Anchorage are entitled to submit evidence to the Spanish Criminal Court and receive damages for any harm they can prove they suffered as a result of the bank's offenses.  A-1737–38.

Also in January 2018, the del Valle Ruiz Appellants, as Mexican nationals protected by the Mexico-Spain Bilateral Investment Treaty, served notice on Spain that they intended to invoke their right to pursue claims against Spain through the treaty's arbitration mechanisms.  A-198–227.  At the end of the six-month "cooling off period" required under the treaty, on August 23, 2018, Appellants filed Requests for Arbitration with the International Center for the Settlement of Investment Disputes (ICSID), which is a public international organization that is part of the World Bank, and under the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL).  A-1445–545.  Among other things, Appellants claim that Spain: (1) violated Appellants' legitimate expectations of good faith treatment for their investments in BPE by arbitrarily disregarding investors and preventing them from taking measures to protect their investment, including measures to carry out a private sale of BPE or raise additional capital for BPE; (2) violated Appellants' legitimate expectations for a stable and predictable legal and regulatory environment for their investments in BPE by unreasonably refusing to take available regulatory measures to support BPE, including measures that Spain had consistently utilized in the past with regard to other troubled financial

institutions; (3) violated Appellants' legitimate expectations of even-handed and non-discriminatory treatment by offering preferential treatment to Santander; (4) violated due process and transparency requirements that form an essential component of fair and equitable treatment under international law, by conducting the sale process with Santander without any transparency, and by failing to provide Appellants with advanced notice or adequate justification for the measures taken with regard to BPE; and (5) illegally expropriated Appellants' shares in BPE and handed them over to Santander without any due process or compensation. *Id.*

## IV.   The District Court Proceedings

The del Valle Ruiz Appellants filed their *ex parte* application for discovery from Santander under 28 U.S.C. §1782 on March 6, 2018.  A-54–95.  Santander moved to intervene on March 8, 2018, and its unopposed motion was granted on March 12, 2018.  Dkt.20, 29.  Less than a month later, PIMCO and Anchorage filed a related §1782 application against Santander and SIS.  A-1627–28.

Section 1782 authorizes "[t]he district court of the district in which a person resides or is found" to "order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal."  28 U.S.C. §1782(a).  It thus sets forth three requirements that must be satisfied before the district court can order the requested discovery: that "(1) the person from whom discovery is sought resides (or is found) in the district of the

district court to which the application is made, (2) the discovery be for use in a proceeding before a foreign tribunal, and (3) the application be made by a foreign or international tribunal or any interested person." *Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117 (2d Cir. 2015). Once those statutory requirements are met, the district court may exercise its discretion to order discovery, taking into account (1) whether the person from whom evidence is sought is a party in the foreign proceedings, (2) the nature of the proceedings abroad, (3) whether the application is an attempt to evade foreign discovery rules, and (4) whether the request is unduly burdensome. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).

The district court held oral argument on Appellants' applications on October 12, 2018. At oral argument, Santander conceded that Appellants had met the second and third statutory requirements under §1782, and argued only that Santander was not "found" in the district and not subject to personal jurisdiction there. A-1577–78; *see* SPA-4. Santander acknowledged that it had raised capital in New York in connection with the BPE acquisition and had conducted "road show" meetings with analysts and investors in New York in support of that capital raise. A-1580–81. However, Santander took the position that because those contacts with New York occurred after the acquisition had been announced, they were irrelevant to the personal jurisdiction analysis. A-1581–83.

18

The district court issued a single opinion and order on October 19, 2018, denying the application by the del Valle Ruiz Appellants and denying the application by the PIMCO and Anchorage Appellants in part. Because Santander conceded that the second and third statutory requirements under §1782 were met, the court focused solely on the first requirement: whether Santander "resides or is found" in the district. SPA-4. The court recognized that §1782 "does not define what it means to 'reside' or be 'found' in a particular district, and '[i]t is unclear whether [Section] 1782's statutory prerequisite that a person or entity reside or be found in a district is coextensive with whether a court has personal jurisdiction over that person or entity.'" SPA-5 (alterations in original) (quoting *In re Sargeant*, 278 F. Supp. 3d 814, 820 (S.D.N.Y. 2017)). The court did not resolve that statutory question, however, because it found that it lacked personal jurisdiction over Santander under the constitutional due process standard. In particular, the district court concluded that it lacked specific jurisdiction over Santander because "Santander's alleged New York activities took place '*after* the Resolution had already been adopted,'" and so (in the district court's view) the discovery request did not "arise out of or relate to Santander's activities in the forum." SPA-15. The court did not address Appellants' uncontested declaration regarding the other actions Santander had taken in New York before the BPE resolution and acquisition to prepare for that transaction, including its consultations with New York-based financial advisors and legal

counsel. The court also gave no explanation for its conclusion that Santander's subsequent related activities in New York—including its securities offering in New York to finance the BPE acquisition—should be wholly excluded from the jurisdictional analysis just because they occurred immediately after the transactions at issue.

The district court granted the PIMCO and Anchorage Appellants' application, however, with respect to SIS, a Santander subsidiary with its principal place of business in the district. SPA-16–17.[2] In reaching that decision, the district court determined that granting the requested discovery would further the "twin aims of Section 1782: providing efficient means of assistance to participants in international litigation … and encouraging foreign countries by example to provide similar means of assistance." SPA-16. It also found that the discretionary *Intel* factors weighed in favor of granting the requested discovery, given that "the documents [petitioners] seek are currently beyond the reach of the foreign tribunals" and that producing those documents would not be "unduly burdensome and intrusive." SPA-16–17.

## SUMMARY OF ARGUMENT

The district court erred both as a statutory matter and as a constitutional matter in finding that it lacked authority to grant Appellants' applications for discovery

---

[2]  On the afternoon of the day on which Appellants filed this opening brief under the stipulated expedited schedule, SIS filed a notice of cross-appeal from the portion of the decision granting discovery against it. A-1626.

under §1782. As a statutory matter, the first requirement of §1782—which was the sole statutory basis for the district court's decision to deny the applications—is easily met here. By the plain text of §1782, and this Court's decision in *Edelman*, that requirement is satisfied whenever a respondent is "found" in the district, which requires nothing more than the minimum contacts necessary to establish specific personal jurisdiction (a standard that easily is met here). Even if §1782 required something more, such as continuous and systematic contacts or physical presence in the district, Santander easily would satisfy those heightened requirements as well, in light of its decades of operating branch offices in New York City, listing its securities on the New York Stock Exchange, taking billions of dollars in deposits in the forum, and its forum activities in planning its acquisition of BPE and carrying out a €7 billion capital raise to facilitate that transaction.

Contrary to Santander's position below, §1782 cannot be construed to create a statutory requirement that the respondent must be subject to *general* jurisdiction in the forum. Section 1782 reaches not only a respondent who "resides" in the district—the equivalent of general jurisdiction—but also one who is "found" there. In light of the extensive caselaw giving "found" its broadest interpretation, Congress clearly intended that language to reach further than the narrow limits of general jurisdiction.

The district court likewise erred in concluding that it lacked authority over Santander as a constitutional matter. The court focused most of its analysis on the constitutional standard for general personal jurisdiction, holding that it did not have general jurisdiction over Santander because Santander is neither incorporated in New York nor has its headquarters there. But even if general jurisdiction is unavailable, the district court still had *specific* personal jurisdiction to order Santander to provide the requested discovery—an issue the district court addressed in only cursory terms. Because Appellants seek only to obtain discovery from Santander, not to impose any liability on Santander or force it to defend its actions, the constitutional requirements of due process authorize a broader jurisdictional reach here than they might in the liability context. In any event, even under the narrower test for specific jurisdiction in the liability context, Santander still is subject to specific jurisdiction in the district. Specific jurisdiction is proper here based on the preparatory steps that Santander took in New York in advance of the BPE resolution and acquisition, which the district court ignored, and also based on the massive capital raise that Santander launched immediately after the resolution to finance the transaction, which the district court inexplicably concluded could not be "related to" the BPE transaction just because it occurred after that transaction. Given those contacts in the district, which are directly related to the BPE resolution and acquisition, the district court plainly had specific jurisdiction over Santander for

purposes of §1782 discovery regarding that transaction.  The decision below should be vacated to permit the district court to order that discovery.

## STANDARD OF REVIEW

The interpretation of §1782 is a question of statutory construction that this Court reviews *de novo*.  *Accent Delight*, 869 F.3d at 128.  The district court's ruling on personal jurisdiction is likewise reviewed *de novo*.  *EMI Christian Music Grp. Inc. v. MP3tunes, LLC*, 844 F.3d 79, 97 (2d Cir. 2016).  "Where, as here, the district court relies on the pleadings and affidavits, and does not conduct a full-blown evidentiary hearing … we construe the pleadings and affidavits in the light most favorable to [the parties asserting jurisdiction], resolving all doubts in their favor." *Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013).

## ARGUMENT

This case involves two distinct questions: (1) whether the district court had statutory authority to order the requested discovery under §1782, because Santander is "found" in the district, and (2) whether the court had constitutional authority to do so, because it had the necessary personal jurisdiction over Santander for that purpose.  The answer to each question is yes.

## I.    Santander Is "Found" in the Southern District of New York Under §1782.

First, the district court had statutory authority under §1782 to order the requested discovery.  Section 1782 is "the product of congressional efforts, over the span of [more than] 150 years, to provide federal-court assistance in gathering

evidence for use in foreign tribunals." *Intel*, 542 U.S. at 247. "The goals of the statute are to provide 'equitable and efficacious' discovery procedures in United States courts 'for the benefit of tribunals and litigants involved in litigation with international aspects' . . . and to 'encourag[e] foreign countries by example to provide similar means of assistance to our courts.'" *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (quoting S. Rep. No. 88-1580 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3782, 3783, and *In re Malev Hungarian Airlines,* 964 F.2d 97, 100 (2d Cir. 1992)). "In pursuit of these twin goals, the statute has, over the years, been given 'increasingly broad applicability.'" *Id.* (quoting *In re Gianoli Aldunate,* 3 F.3d 54, 57 (2d Cir. 1993)).

Of §1782's three threshold requirements, only one is in dispute here: whether Santander "resides or is found" in the Southern District of New York. The district court found it "unclear" whether this statutory language "is coextensive with whether a court has personal jurisdiction over that person or entity," and other district courts in this circuit have framed the statutory test in a variety of ways. SPA-5. This Court's prior interpretation of §1782, and judicial interpretation of other statutes using the same or similar language—dating back to the Judiciary Act of 1789—make clear that §1782 covers any person whose minimum contacts with the forum are sufficient to satisfy due process (a standard Santander easily meets). But even if the statute were read to impose a stricter standard than the outer bounds of

due process, Santander is "found" in the Southern District of New York under any plausible interpretation of that term.

### A. A Person Is "Found" for Purposes of §1782 Wherever That Person Is Subject to Personal Jurisdiction.

This Court has addressed §1782's "resides or is found" requirement before, and interpreted it broadly. In *In re Edelman*, 295 F.3d 171 (2d Cir. 2002), a respondent in a §1782 discovery proceeding sought to quash a subpoena personally served on him during a brief visit to New York, contending that because he lived in France, he was not "found" in the Southern District of New York. *Id.* at 174. Reviewing the statutory text, the *Edelman* court quickly found support for "a flexible reading of the phrase 'resides or is found,'" based on the broad discretion the district court has once the threshold requirements are met, and on the statute's incorporation of the protections for non-party witnesses under Federal Rule of Civil Procedure 45. *Id.* at 178. Congress, the Court noted, repeatedly amended the statute to broaden it. The 1948 version of the statute authorized "'[t]he deposition of any witness *residing* within the United States.'" *Id.* at 179 (quoting Act of June 25, 1948, ch. 646, 62 Stat. 949, 949). The next year, Congress struck the word "residing," thus authorizing depositions of "'any witness within the United States.'" *Id.* (quoting Act of May 24, 1949, Pub. L. No. 81-72 §93, 63 Stat. 89, 103); *see also id.* at 180 (noting that the committee report on the amendment expressly identified depositions of people "sojourning" in the district (quoting H.R. Rep. No. 81-352, at 40 (1949), *reprinted*

*in* 1949 U.S.C.C.A.N. 1254, 1270) (emphasis omitted)). And in 1964, Congress rewrote §1782 to give district courts discretion to order broader discovery, adopting the "resides or is found" language that remains in the statute to this day. *Id.* at 180 (citing Act of Oct. 3, 1964, Pub. L. No 88-619, §9(a), 78 Stat. 997, and S. Rep. No. 88-1580, §9, *reprinted in* 1964 U.S.C.C.A.N. at 3788–90).

Tellingly, this Court in *Edelman* expressly connected "the question of what it means to be found in a particular locale" to "well-settled case law on territorial jurisdiction." *Id.* at 179. Invoking the Supreme Court's authorization of "the exercise of personal jurisdiction based on nothing more than physical presence," *id.* (citing *Burnham v. Super. Ct. of Cal.*, 495 U.S. 604 (1990)), this Court held that service in the district sufficed for §1782 too: "Given that this so-called tag jurisdiction is consistent with due process, we do not think that § 1782(a), which is simply a discovery mechanism and does not subject a person to liability, requires more." *Id.* at 179. This Court thus defined a district court's jurisdiction under the "found" prong of §1782 coextensively with—and by reference to—the limits of personal jurisdiction consistent with due process, demonstrating that the statute requires nothing more than the minimum contacts sufficient to create personal jurisdiction.

**B.    Scores of Other Statutes Use "Found" in the Same Way.**

Even if *Edelman* were somehow inapplicable to corporate entities, the statutory text still demonstrates that a person is "found" in a district whenever they have the minimum contacts necessary for specific personal jurisdiction. That is the consistent interpretation that courts have applied to numerous other statutes using the term "found."

Congress was not drafting in a vacuum when it expanded §1782 in 1964 to cover respondents who "reside[] or [are] found" in the district. That phrase (or similar ones such as "is found or is an inhabitant") appears in over one hundred federal statutes in force—dating back to the Judiciary Act of 1789, which "permitted a plaintiff to file suit in a federal district court if the defendant was 'an inhabitant' of that district or could be 'found' for service of process in that district." *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1518 (2017) (citing Act of Sept. 24, 1789, §11, 1 Stat. 79).[3] Along similar lines, the Securities Act of 1933 authorizes suits "in the district wherein the defendant *is found* or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and process in such cases may be served

---

[3]    In 1887, Congress amended the Judiciary Act, deleting the "found" provision—demonstrating that it understood the breadth of that term, and meant to limit venue more narrowly. *See TC Heartland*, 137 S. Ct. at 1518 (citing Act of Mar. 3, 1887, §1, 24 Stat. 552, 552–53). That narrower approach remains to this day in the modern venue statute, 28 U.S.C. §1391(b), which turns on where defendants "reside[]" and not where they are "found."

in any other district of which the defendant is an inhabitant or wherever the defendant may be found." 15 U.S.C. §77v(a) (emphasis added). The Securities Exchange Act of 1934 contains comparable language, 15 U.S.C. §78aa(a), as does the antitrust venue provision, 15 U.S.C. §15. The Racketeer Influenced and Corrupt Organizations Act likewise authorizes suit "in the district court of the United States for any district in which such person resides, *is found*, has an agent, or transacts his affairs." 18 U.S.C. §1965(a) (emphasis added). So too for ERISA, which likewise authorizes suit "where the plan is administered, where the breach took place, or where a defendant resides *or may be found*, and process may be served in any other district where a defendant resides or may be found." 29 U.S.C. §1132(e)(2) (emphasis added).

For every one of those statutes, courts have broadly construed Congress's use of the term "found." For example, the Seventh Circuit reviewed decisions interpreting a variety of statutes that employ "found" language, concluding that "[a] fund can be found in a judicial district if it has the sort of 'minimum contacts' with that district that would support the exercise of personal jurisdiction under the rule of *International Shoe Co. v. Washington*." *Waeltz v. Delta Pilots Ret. Plan*, 301 F.3d 804, 810 (7th Cir. 2002). The Ninth Circuit reached substantially the same conclusion as to ERISA's "found" language in *Varsic v. U.S. District Court*, 607 F.2d 245, 248 (9th Cir. 1979), specifically noting that it was "significant that the

term 'found,' employed by Congress in section 1132(e)(2), has been construed liberally when used in other venue provisions." *Id.*; *accord I.A.M. Nat. Pension Fund v. Wakefield Indus., Inc.*, 699 F.2d 1254, 1257 (D.C. Cir. 1983) ("The Ninth Circuit's resort in *Varsic* to the current due process test for *in personam* jurisdiction of a corporation to determine the meaning of 'found' as a venue requirement is, we think, sound.") And long ago, Judge Learned Hand held that the Sherman Act's "found" provision was intended "to remove the existing limitations upon the venue of actions between diverse citizens and to permit the plaintiff to sue the defendant wherever he could catch him with a process good where it was executed." *Thorburn v. Gates*, 225 F. 613, 615 (S.D.N.Y. 1915).

Section 1782's formulation of "residing" or being "found" in the district, moreover, appears in at least two statutes that have received significant judicial attention. In each case, it has been given a broad interpretation. The copyright venue statute provides that "Civil actions, suits, or proceedings arising under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent *resides or may be found*." 28 U.S.C. §1400(a) (emphasis added). The "found" language has routinely been interpreted by district courts in this Circuit as authorizing jurisdiction coextensive with the limits of personal jurisdiction. *E.g.*, *Cavu Releasing, LLC v. Fries*, 419 F. Supp. 2d 388, 394 (S.D.N.Y. 2005) ("A defendant 'may be found' wherever that

person is amenable to personal jurisdiction."); *Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.*, 829 F. Supp. 62, 66 (S.D.N.Y. 1993) ("It is well-established that a defendant 'may be found' in any district in which he is subject to personal jurisdiction; thus, venue and jurisdiction are coextensive."); *Sygall v. Pitsicalis*, No. 18-CV-2730 (VSB), 2018 WL 5981994, at *2 (S.D.N.Y. Nov. 14, 2018) ("A defendant 'may be found' wherever that person is amenable to personal jurisdiction.").

By contrast, §1400(a)'s neighbor, the patent venue statute, limits venue in patent cases to "the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. §1400(b). The reason for the restriction on venue in this context, the Supreme Court has explained, is an 1897 statute intended to clarify that the 1887 removal of "found" from the general venue statute also applied to patents. *TC Heartland*, 137 S. Ct. at 1518 ("[W]hile some courts continued to apply the Act to patent cases, others refused to do so and instead permitted plaintiffs to bring suit (in line with the pre–1887 regime) anywhere a defendant could be *found* for service of process. . . . In 1897, Congress resolved the confusion by enacting a patent specific venue statute." (emphasis added)). Thus, the Supreme Court's *TC Heartland* ruling confirms the breadth of the term "found," in contrast to the narrower concept of residence. *See, e.g.*, *Andra Grp., LP v. BareWeb, Inc.*, No. 4:17-CV-00815, 2018

WL 2848985, at *7 (E.D. Tex. June 11, 2018) (rejecting the argument that *TC Heartland* changed the extensive caselaw interpreting "found" as coextensive with the limits of personal jurisdiction).

The IRS summons statute, moreover, similarly confers jurisdiction to enforce summonses on "the district in which such [summonsed] person resides or may be found." 26 U.S.C. §7402(b); *see also* 26 U.S.C. §7604(a) (similar jurisdiction for enforcement of third party summons); 26 U.S.C. §7604(b) (similar jurisdiction for contempt proceedings). Likewise, for challenges to a third party summons, "[t]he United States district court for the district within which the person to be summoned resides or is found" has jurisdiction to hear proceedings seeking to quash the summons. 26 U.S.C. §7609(h)(1). In the summons context, courts consistently have understood "found" to "confer[] broad jurisdictional authority upon the district courts." *United States v. Toyota Motor Corp.*, 561 F. Supp. 354, 357 (C.D. Cal. 1983); *see also United States v. Sneeky Theef Records, Inc.*, 526 F. Supp. 434, 437 (N.D.N.Y. 1981) (applying personal jurisdiction analysis).

In short, construing a wide variety of statutes, courts routinely have held that a requirement that a person be "found" in the district extends to the limits of personal jurisdiction. Thus, even if the limits of "found" jurisdiction under §1782 were not resolved by *Edelman*, this Court should read §1782's "found" language broadly to

cover any person or entity that has the minimum contacts with the forum necessary to establish specific personal jurisdiction.

## C.   Under Any Plausible Standard, Santander Is "Found" in the Southern District of New York.

Under the minimum-contacts standard, Santander undeniably is "found" in the Southern District of New York.  It has operated branch offices in the district for decades; it does substantial business in the district, including some $25.2 billion in deposits; it is listed on the New York Stock Exchange; and it is subject to service of process here.  A-99–101, 278, 290, 327.  Santander also has engaged in activities in the district specifically related to the transactions that are the subject of the requested discovery, including working with financial advisors and legal counsel in New York to prepare for its acquisition of BPE, and then conducting a securities offering in New York as part of a €7 billion capital raise for the stated purpose of financing that acquisition.  A108, 327–54, 356–57, 374, 469.  Those voluntary activities in the forum are more than sufficient to create the kind of minimum contacts that give rise to specific personal jurisdiction.

Even if this Court were to read §1782 to require more than minimum contacts to show that the respondent is "found" in the district, Santander still would meet any plausible heightened standard.  For instance, a number of district courts reviewing §1782 applications have looked to whether an entity has "systematic and continuous" contacts with the district in order to determine whether the entity is

found there. *E.g.*, *In re Kleimar N.V.*, 220 F. Supp. 3d 517, 521 (S.D.N.Y. 2016) (corporation was "found" in New York because it issued securities that it had listed on the New York Stock Exchange, had an agent for service of process, was closely tied to a subsidiary that operated in New York, and conducted "systematic and regular business in . . . New York"); *In re Republic of Kazakhstan*, 110 F. Supp. 3d 512, 515 (S.D.N.Y. 2015) (finding that the "daily practice of law in this jurisdiction" by partners gave law firm "the requisite 'systematic and continuous' presence to be 'found' here for purposes of Section 1782"). Here, Santander has maintained "systematic and continuous" contacts with New York City, conducting billions of dollars in business through its New York branch and listing its securities on the New York Stock Exchange for decades. *See* A-99–101, 278, 290, 327.

A few district courts construing the word "found" in other statutes have required an "actual physical presence" in the forum, such as the operation of a branch office. *See, e.g.*, *Cayman Nat. Bank, Ltd. v. United States*, 8:06-MC-50-T-24 MAP, 2007 WL 641176, at *3 (M.D. Fla. Feb. 26, 2007) (construing 26 U.S.C. §§7402(b) and 7604(a)); *see also Mensh v. United States*, 08-CV-4162 (DLI)(ALC), 2009 WL 2242295, at *2 (E.D.N.Y. July 27, 2009) (construing 26 U.S.C. §7609(h)(1)). To the extent it applies, that additional requirement is likewise met here. Banco Santander and Santander Bank each maintain an "actual physical presence" in New York by operating their branch offices here (as they have done for decades). *See* A-

99–101, 278, 290, 327.  In short, under any plausible reading, Santander is "found" in New York.

### D.    Section 1782 Cannot Be Read to Require General Jurisdiction.

Despite the extensive caselaw interpreting §1782 and similar statutes to mean that a respondent is "found" in the district whenever it has the minimum contacts necessary for specific personal jurisdiction, Santander nevertheless argued below that §1782 requires far more: that the respondent must be subject to *general* jurisdiction in the district, meaning that (in most circumstances) it must be "incorporated or ha[ve] its principal place of business" there.  *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).  The district court correctly rejected that extreme position, which cannot be squared with the statutory text or the relevant precedent. Section 1782 reaches not only a respondent who "resides" in the district—the equivalent of general jurisdiction—but also any respondent who "is found" in the district.  28 U.S.C. §1782(a).  Limiting §1782 to respondents that are subject to general jurisdiction would effectively read the words "is found" out of the statute. *See, e.g.*, *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018) (statutes should be construed "so that no part will be inoperative or superfluous").

If Congress truly had intended to limit §1782 to cases where the respondent was subject to general jurisdiction in the district—that is, cases where the respondent was incorporated or had its principal place of business in the district—it could easily

have said so.  *Cf.* 28 U.S.C. §1332(c)(1) (corporation is a citizen of every state where "it has been incorporated [or] has its principal place of business").  Congress's decision to use broader language was intentional, reflecting a conscious decision to give §1782 broader reach.  *See Brandi-Dohrn*, 673 F.3d at 80 (noting that §1782 "has, over the years, been given 'increasingly broad applicability'").

Under Santander's reading, the only conceivable application of "is found" in §1782 would be to cases of tag jurisdiction.  *See, e.g.*, *Edelman*, 295 F.3d at 179. But given the long history of that phrase, the consistently broad judicial interpretation it has received, and the underlying purposes of §1782 itself, it is untenable to suggest that tag jurisdiction was all that Congress had in mind by including those words.  *See supra* Part I.B.  Because Congress plainly intended §1782 to reach further than the narrow limits of general jurisdiction, and because Santander is "found" in the Southern District of New York under any plausible reading of that term, the district court had statutory authority to order the requested discovery.

## II.   The District Court Had Specific Jurisdiction to Order Santander to Provide the Requested Discovery.

In addition to the necessary statutory authority, the district court also had the constitutional power to order the requested discovery under §1782.  To comport with due process, a district court "must have personal jurisdiction over a nonparty in order to compel it to comply with a valid discovery request."  *Gucci Am., Inc. v. Weixing*

35

*Li*, 768 F.3d 122, 141 (2d Cir. 2014). That constitutional requirement easily was met here.

To begin with, there is good reason to believe that the district court had *general* jurisdiction over Santander for discovery purposes, in light of its systematic and continuous contacts with New York. In *Daimler*, the Supreme Court held that a corporation is normally subject to general jurisdiction only where it is incorporated and where it has its principal place of business. 571 U.S. at 137–39. But as this Court has recognized, *Daimler* involved personal jurisdiction to impose liability on a civil defendant, not to order discovery from a non-party respondent. *Gucci*, 768 F.3d at 134 n.13. While this Court has suggested the general jurisdiction standard should be the same in both contexts, *see id.*, there is good reason to believe that standard should be broader in the discovery context, given the lower burden imposed on respondents. *Cf. infra* Part II.A. In addition, *Daimler* involved the constraints imposed on *state* courts by the Due Process Clause of the Fourteenth Amendment, not the constraints imposed on *federal* courts by the Due Process Clause of the Fifth Amendment. While this Court has indicated that the standard under either Amendment is the same, *see Waldman v. PLO*, 835 F.3d 317, 329 (2d Cir. 2016), other courts have disagreed, *see Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs.*, 791 F.3d 436, 444 (4th Cir. 2015), and the Supreme Court

has reserved the question, *see Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1783–84 (2017), indicating that further review is warranted.

In any event, this Court need not address the issue of whether the district court was correct to conclude that it lacked general personal jurisdiction over Santander. Even assuming that the district court was correct to conclude that it lacked *general* jurisdiction, the district court at least had *specific* jurisdiction to order Santander to provide the requested discovery.

### A. Specific Jurisdiction Reaches More Broadly in the Discovery Context than in the Liability Context.

To start, the district court erred by applying the same standard for specific jurisdiction in the discovery context that applies in the liability context. *See* SPA-14. As this Court has made clear, due process permits a more expansive approach to specific jurisdiction in the discovery context than for liability. After all, "a person who is subjected to liability by service of process far from home may have better cause to complain of an outrage to fair play than one similarly situated who is merely called upon to supply documents or testimony." *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 20 (2d Cir. 1998). Given that §1782 "is simply a discovery mechanism and does not subject a person to liability," *Edelman*, 295 F.3d at 179, there is every reason to believe it should not be constrained by the same jurisdictional standard that applies in the liability context—especially given the

"broad applicability" that Congress intended for the statute to have, *Brandi-Dohrn*, 673 F.3d at 80.

Put simply, the "non-party status" of a §1782 respondent "alter[s] the equities of asserting jurisdiction." *Gucci*, 768 F.3d at 137 n.17. Unlike a defendant in a civil action, a §1782 respondent is not being called on to answer any claims against it, and faces no risk of damages or other sanctions for its past conduct. *See* Rhonda Wasserman, *The Subpoena Power: Pennoyer's Last Vestige*, 74 Minn. L. Rev. 37, 42 (1989) (observing that as a general matter, "a subpoena burdens an out-of-state witness far less severely than a summons burdens a nonresident defendant"). It is thus wholly consonant with due process to apply a broader standard to determine which entities can fairly be required to face the lighter burden of discovery in the forum than to determine which entities can be forced to appear as a civil defendant in the liability context.

While the Supreme Court has not yet considered the standard for specific jurisdiction in the non-party discovery context, its precedents are consistent with the view that the standard should be broader in that context because the burden is lighter. In *Phillips Petroleum Co. v. Shutts*, for instance, the Court held that due process permits a court to assert personal jurisdiction over an absent plaintiff even when that plaintiff "may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant." 472 U.S. 797, 811 (1985). In *Shutts*,

the respondents brought a nationwide class action against the petitioner in Kansas state court. The Kansas court exercised personal jurisdiction over non-named class action plaintiffs who had automatically been joined. The Supreme Court upheld that exercise of jurisdiction, finding that due process allowed the state court to exercise jurisdiction over those absent plaintiffs and adjudicate their claims even though they lacked the contacts with the forum that would be necessary if the state court had sought to impose liability on those same absent persons. As the Court explained, "[b]ecause States place fewer burdens upon absent class plaintiffs than they do upon absent defendants in non-class suits, the Due Process Clause need not and does not afford the former as much protection from state-court jurisdiction as it does the latter." *Id.*; *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 847-48 (1999) (discussing *Shutts*).

Other Supreme Court precedents confirm the central role that burden plays in the due process analysis. The touchstone of constitutional due process is "fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). As such, when assessing personal jurisdiction, "the 'primary concern' is 'the burden on the defendant.'" *Bristol-Myers Squibb*, 137 S. Ct. at 1776 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)); *see also World-Wide Volkswagen*, 444 U.S. at 291–92 (explaining that personal jurisdiction protects a defendant "against the

burdens of litigating in a distant or inconvenient forum"). Because the burden imposed on a non-party respondent in the discovery context is categorically lighter than the burden imposed on a defendant facing civil liability, the test for personal jurisdiction is correspondingly easier to satisfy.

Requiring a showing that a non-party from whom discovery is sought is subject to personal jurisdiction for *liability* purposes is also impractical, and would drastically complicate non-party discovery in ordinary domestic litigation. While Rule 45(b)(2) permits nationwide service of process of subpoenas in federal court, foreign entities might well seek to quash domestic subpoenas by claiming that they are not subject to personal jurisdiction for liability purposes. That would require much more common resort to the slow, burdensome, and frequently ineffectual letters-rogatory process. *See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 21 (1st Cir. 2004) ("Under the best of circumstances, letters rogatory are burdensome, costly, and time-consuming."); *Da Rocha v. Bell Helicopter Textron, Inc.*, 451 F. Supp. 2d 1318, 1325 (S.D. Fla. 2006) (describing letters rogatory as "notoriously inefficient"); Federal Judicial Center, *Discovery in International Civil Litigation: A Guide for Judges* §II(B)(2)(c) (2015), *available at* 2015 WL 9056194 ("Not only is the letters rogatory procedure unpredictable, it is also notoriously slow and cumbersome. The Department of State currently estimates that execution of letters rogatory can take a year or more.").

In state court, even *domestic* discovery would be much more complicated: because states lack the nationwide service of process authority for subpoenas that federal courts have under Rule 45(b)(2), parties would have to show that subpoena recipients were subject to the state's personal jurisdiction for liability purposes in order to serve them with valid subpoenas.  While domestic non-parties might still be compelled to give their evidence through resort to applications to their home states' courts, restricting the subpoena jurisdiction of state courts to their personal jurisdiction for liability purposes would certainly increase the cost of non-party discovery from non-residents significantly.  In short, neither the Constitution nor common sense supports limiting personal jurisdiction for discovery purposes to the narrower bounds of personal jurisdiction for liability purposes.

**B.      Under Any Standard, the District Court Had Specific Personal Jurisdiction Over Santander.**

Even if this Court were to apply the same standard for personal jurisdiction in the discovery context that applies in the liability context, the district court still would have specific personal jurisdiction to order Santander to provide the requested discovery.   As this Court recognized in *Gucci*, the "touchstone due process principle" of personal jurisdiction is that a court may exercise jurisdiction over any person or entity with "sufficient 'minimum contacts' with the forum 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  768 F.3d at 134 (quoting *Int'l Shoe Co.*, 326 U.S. at 316).  In

the liability context, to determine whether a court has specific personal jurisdiction over a civil defendant, due process "requires a two-step analysis." *Id.* at 136. "First, the court must decide if the defendant has 'purposefully directed his activities at the forum and the litigation arises out of or relates to those activities.'" *Id.* (ellipses and brackets omitted) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "Second, once the court has established these minimum contacts, it determines whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Id.* (brackets omitted) (quoting *Burger King*, 471 U.S. at 476).

By its terms, that standard applies to defendants in the liability context, not non-parties in the discovery context (which is why the district court erred by attempting to apply it without any modification here, *see* SPA-14). Other federal courts therefore have "translated" the test for specific jurisdiction in the liability context into the non-party discovery context by "focusing on the connection between the nonparty's contacts with the forum and the discovery order at issue." *Gucci*, 768 F.3d at 141 (citing *In re Application to Enforce Admin. Subpoenas of the SEC v. Knowles*, 87 F.3d 413, 418 (10th Cir. 1996)); *see also id.* at 137 (in assessing jurisdiction over nonparties, courts "first assess the connection between the nonparty's contacts with the forum and the order at issue, and then decide whether

exercising jurisdiction for the purposes of the order would comport with fair play and substantial justice").

As described above, there is good reason to apply the "adapted" standard for specific jurisdiction more broadly in the nonparty discovery context than its counterpart in the liability context, since a nonparty who is "merely called upon to supply documents or testimony" faces a lower burden than "a person who is subjected to *liability* by service of process far from home." *First Am.*, 154 F.3d at 20; *see Gucci*, 768 F.3d at 137 n.17. But even if this Court were to apply the test for specific jurisdiction in the non-party discovery context just as strictly as its equivalent in the liability context, Santander still would be subject to specific personal jurisdiction in the Southern District of New York for purposes of the discovery requested here. Santander has extensive contacts with New York (and with the Southern District in particular), and has purposefully availed itself for decades of the privilege of doing business here. The discovery requested here is also specifically related to those contacts: it focuses on a transaction that Santander prepared for in the Southern District in advance of the BPE resolution, and then facilitated immediately after the resolution by its securities offering and "road show" meetings in New York for its €7 billion capital raise to finance the acquisition. In light of Santander's extensive activities in New York, the immense benefits it has derived from doing business in this jurisdiction, and the relatively light burden

involved in requiring Santander to provide the requested discovery, exercising jurisdiction here would easily comport with fair play and substantial justice. Due process therefore allows the district court to grant the §1782 applications.

> 1. **Santander Purposefully Availed Itself of the Privilege of Doing Business in New York, and the Requested Discovery Is Related to Its Activities in New York.**

There can be no question that Santander has "purposefully availed itself of the privilege of doing business in [New York]." *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 170 (2d Cir. 2013) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)). Santander has conceded in previous cases that it maintains offices and conducts business in the Southern District of New York. *See In re Alghanim*, No. 17-mc-406, 2018 WL 2356660 at *2 (S.D.N.Y. May 9, 2018). Banco Santander has maintained a branch in Manhattan since 1977, holding more than $25.2 billion in deposits. A-99, 278, 1846, 2362. That branch is regulated by the New York Department of Financial Services, and has been used to extend billions of dollars of credit to other members of the Santander group. A-99, 285. Banco Santander also has been listed on the New York Stock Exchange for decades, listing its New York branch on 53rd Street as its agent for service of process in connection with that listing. A-100–01, 290, 327. Santander Bank likewise maintains numerous branches in New York and does substantial business here. A-99–100. In fact, the Santander group as a whole constitutes the ninth largest banking

group by deposit share in the New York area. A-280. Those extensive contacts in New York are more than enough to show that Santander has "purposefully directed [its] activities at residents of the forum." *Burger King*, 471 U.S. at 472.

Santander also has purposefully directed its activities at New York in ways that specifically relate to the discovery request at issue here. By their §1782 applications, Appellants seek information from Santander regarding the resolution of BPE and its acquisition by Santander for the nominal price of €1. *See* A-81–95. Both before and after that resolution, Santander took steps in New York to prepare for and execute its acquisition of BPE. Before the resolution, Santander worked with financial advisors and lawyers in New York to plan and prepare for its acquisition of BPE. A-108, 307–25, 344, 469. In addition, Appellants have argued (and Santander has not denied) that its CEO likely also discussed plans to acquire BPE and undertook other activity in support of the planned acquisition while he was in New York to ring the closing bell on the New York Stock Exchange, less than a week before the resolution and acquisition took place. A-290. As a result of the acquisition, Santander became the owner of U.S.-based TotalBank N.A (which it subsequently sold to Banco de Crédito e Inversiones for $528 million). A-1835, 1982, 2211–13. And after the BPE resolution and acquisition, Santander engaged in an intensive campaign to raise capital in New York to support the acquisition, including "road show" meetings with analysts and investors in New York and legal

work through its New York counsel to launch its €7 billion capital raise to finance the transaction. A-296, 307–25, 344, 1551, 1580–81. Shortly after completing its capital raise, Santander chose to hold its Group Strategy Update investor meeting, at which it presented on its strategy for the newly-merged group, at the New York Stock Exchange. A-292–93. Those activities, all of which took place in or were directed at New York, are indisputably related to the resolution and acquisition as to which Appellants seek discovery, and easily show an adequate "connection between [Santander's] contacts with the forum and the discovery order at issue." *Gucci*, 768 F.3d at 141.

The basis for specific jurisdiction here is at least as strong as the basis that has been deemed sufficient in other cases. In *Gucci*, for instance, this Court remanded for the district court to determine whether it had specific jurisdiction to require the non-party Bank of China to comply with a subpoena requesting documents relating to any accounts held by any defendant in the case at any branch of that bank. *Id.* at 141–42; *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 91 (S.D.N.Y. 2015). On remand, Judge Sullivan (before his elevation to this Court) held that specific jurisdiction was authorized by the New York long-arm statute and complied with constitutional due process. *Gucci*, 135 F. Supp. 3d at 93–101. Like Santander here, Bank of China had "significant operations, employees, and physical locations in New York, actively solicits business and customers in New York, and has deliberate

46

and recurring contacts with New York." *Id.* at 98. Bank of China also engaged in contacts with New York that were specifically related to the subpoena requests—in particular, by using a correspondent account in New York to facilitate "nearly a dozen" wire transfers to accounts used by the defendants. *Id.* at 94–95, 97–98. In light of those contacts, the court held, Bank of China had "purposefully availed itself" of the privilege of doing business in New York, and its conduct was "sufficiently related to the subpoena enforcement action that is the subject of this dispute"—a subpoena for information about all of the defendants' accounts at Bank of China—in order to support specific jurisdiction over the subpoena. *Id.* at 99; *see also Nike, Inc. v. Wu*, 13-CV-8012, 2018 WL 4907596 (S.D.N.Y. Sept. 25, 2018) (reaching a similar conclusion on similar facts).

The same logic applies here. As described above, Santander conducts extensive banking operations in New York that easily are on the same scale as those conducted by Bank of China. *Supra* pp.8–9. And the specific discovery-related contacts in this case are orders of magnitude stronger: where *Gucci* involved less than a dozen wire transfers that happened to pass through New York on their way to some of the relevant accounts at Bank of China, *see* 135 F. Supp. 3d at 94, this case involves not only significant preparatory activities by Santander in New York before the resolution and acquisition, but also extensive "road show" meetings and a securities offering in New York as part of a €7 billion capital raise to finance the

transaction. *Supra* pp.9, 13–14.  Those contacts more than suffice to permit specific jurisdiction for discovery regarding the directly related BPE resolution and acquisition.

### 2.    The District Court's Contrary Decision Misread Both the Facts and the Applicable Law.

The district court's decision that it lacked specific jurisdiction over Santander erred on multiple levels.  The district court inexplicably concluded—based solely on Santander's brief below—that "all of Santander's alleged New York activities took place '*after* the Resolution had already been adopted,'"  and so could not be related to the resolution and acquisition.  SPA-15 (quoting Dkt.34 at 14).  That is factually and legally wrong.

First, as a factual matter, Appellants' declarations described numerous activities by Santander in New York before the BPE resolution and acquisition. *Supra* pp.8–9.  Those included not just its ongoing activities in New York— maintaining branch offices there, holding billions of deposits there, listing its shares on the New York Stock Exchange, etc.—but also the additional actions that Santander took in New York specifically to *prepare* for the acquisition of BPE, which occurred *before* the resolution and acquisition actually took place.   In particular, Santander retained and worked with financial advisors and legal counsel in New York before the BPE resolution to prepare for the BPE acquisition, and there is reason to believe that its CEO engaged in discussions in New York regarding the

upcoming resolution and acquisition less than a week before that transaction took place. A-290; *see Dorchester Fin. Secs.*, 722 F.3d at 85 (where a court determines personal jurisdiction "on the pleadings and affidavits," it must "construe the pleadings and affidavits in the light most favorable to [the parties asserting jurisdiction]" and "resolv[e] all doubts in their favor"). The district court itself even recognized some of those pre-resolution contacts, acknowledging that "Santander allegedly retained investment banks in New York, *prior to the sale of Banco Popular*, to explore financing options for its acquisition." SPA-14 (emphasis added). The district court gave no explanation for then ignoring those contacts on the very next page of its opinion and concluding that "all of Santander's alleged New York activities took place *after* the Resolution had already been adopted." SPA-15. That clear factual error alone is enough to undermine the district court's analysis and require vacating the decision below.

The district court equally erred as a legal matter in concluding that Santander's immediate post-acquisition activities in the forum—including its New York activities supporting its €7 billion capital raise to finance the transaction at issue— were somehow categorically irrelevant to the specific jurisdiction analysis. The district court cited no case for that proposition, and its view cannot be reconciled with established law. As both the Supreme Court and this Court have explained, even in the liability context, the minimum contacts inquiry applies whenever the suit

"arises out of *or relates to* the defendant's contacts with the forum." *Daimler*, 571 U.S. at 127 (brackets omitted) (emphasis added); *see also, e.g.*, *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018); *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010). That standard imposes no mandatory temporal requirement; instead, this Court has explained, it "merely requires the cause of action to 'relate to' defendant's minimum contacts," regardless of whether the subject matter of the suit occurred before or after those contacts. *Chloé*, 616 F.3d at 167; *see also, e.g.*, *McGraw-Hill Global Educ. Holdings, LLC v. Mathrani*, 295 F. Supp. 3d 404, 411–12 (S.D.N.Y. 2017).

This Court's decision in *Chloé* provides a prime example. In that case, a luxury handbag designer called Chloé brought a trademark infringement suit in the Southern District of New York against defendants that sold counterfeit handbags. To support personal jurisdiction, it presented evidence that the defendants had shipped a single counterfeit Chloé handbag into New York, as well as 52 other handbags representing different brands. 616 F.3d at 162–63. The district court held that the only relevant contact for due process purposes was the shipment of the Chloé handbag, since that was "the only activity upon which [the] complaint is based." *Id.* at 167. But this Court reversed, holding that the district court had "too narrowly construe[d] the nexus requirement" by ignoring the defendants' other relevant contacts with New York—including their sale of other designer merchandise in New

York, which demonstrated that defendants had carried out "a larger business plan purposefully directed at New York consumers." *Id.* As such, this Court concluded that the relevant contacts "include the more than fifty sales of designer handbags into New York and are not limited to the narrow subset of one sale that involved a Chloé handbag." *Id.*

Most relevant here, this Court reached that conclusion without any inquiry into whether the other handbags were sold before or after the Chloé handbag that was the premise of the suit. *Id.* at 163, 166–67. Because those sales were all part of a single "business plan" that related to the underlying suit, this Court concluded that they should all be considered as part of the jurisdictional inquiry. *Id.* at 167. The same logic applies here. Because Santander's activities in New York to finance the BPE acquisition were indisputably part of the same overall business plan as the actual resolution and acquisition, they cannot be excluded from the specific jurisdiction analysis, regardless of whether those activities occurred before or after the resolution was ordered.

This Court undertook the same analysis in *Bank Brussels Lambert*, in an opinion by then-Judge Sotomayor. In that case, a Belgian bank sued its Puerto Rican law firm for malpractice, focusing specifically on an opinion letter that the law firm issued about the enforceability of a certain security interest. 305 F.3d at 123. As in *Chloé*, the district court in *Bank Brussels* "focused on the contacts which directly

gave rise to the cause of action" (in particular, the communications regarding the opinion letter), and found those contacts insufficient to support jurisdiction. *Id.* at 127. And as in *Chloé*, this Court reversed, holding that the district court "took too narrow a view of the relevant contacts." *Id.* This Court explained that the defendant had numerous other business contacts with New York, such as performing work for New York clients, faxing newsletters on Puerto Rican legal developments to numerous persons in New York, and maintaining an apartment in New York in order to serve its New York clients. "[W]hile these contacts may not have directly given rise to the plaintiff's cause of action, they certainly 'relate to' it," and so this Court concluded that they should properly be considered in the specific jurisdiction analysis. *Id.* at 128. Once again, the parallel here is clear. Even if Santander's activities in New York to raise €7 billion in capital to finance the takeover of BPE

did not "directly give[] rise to" the resolution and acquisition, they are inextricably "relate[d] to" that transaction. *Id.*[4]

On top of that, the planned capital raise *did* in fact play a role in giving rise to the transaction at issue, insofar as it was necessary to make that transaction possible. As Santander's own prospectus explained, the €7 billion capital raise was needed "to reinforce and optimize the Bank's equity structure to adequately cover the addition of BPE following the Acquisition." A-357. Because Santander was aware even before the resolution that such a capital raise would be necessary to implement its acquisition, and relied on that planned capital raise in deciding to enter into the transaction, the district court erred by refusing to consider the New York activities supporting that capital raise as relevant contacts in the specific jurisdiction analysis.

Taking the entire record into account, Santander's pre- and post-resolution activities in New York easily suffice to give the district court specific jurisdiction to order Santander to produce the full scope of the requested discovery. As other

---

[4] This Court's decisions interpreting the New York long-arm statute likewise illustrate the breadth of the relatedness requirement. In that context, this Court has explained that under New York law, a claim arises from a defendant's contacts with the forum whenever there is "some articulable nexus" or "substantial relationship" between the claim and those contacts, even without any close causal relationship. *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006); *see Licci*, 732 F.3d at 168–69 (requiring only that the claim "is not completely unmoored from" the forum contacts). Although the New York long-arm statute and constitutional due process "are not coextensive," the standards in both instances are similar, and "[i]t would be unusual, indeed" for a defendant to be subject to jurisdiction under the former but not the latter. *Licci*, 732 F.3d at 170.

district courts have correctly understood, specific jurisdiction to order discovery authorizes not just discovery about the respondent's contacts with the forum *themselves*, but discovery about all transactions *related to* those contacts. *Cf. Chloé*, 616 F.3d at 167 (specific jurisdiction must "merely … 'relate to' defendant's minimum contacts"). For instance, in *Gucci* on remand, Judge Sullivan did not limit the plaintiff to discovery regarding the specific contacts that gave rise to personal jurisdiction over Bank of China—that is, the "nearly a dozen" wire transfers from New York to the defendants' Bank of China accounts. 135 F. Supp. 3d at 94. Instead, the court extended discovery to cover "all documents and communications regarding Defendants or their accounts" and "all documents associated with any accounts or deposits held in any Defendant['s] name," whether or not those accounts themselves had any connection with New York. *Id.* at 104. So too here: given that Santander purposefully availed itself of the privilege of doing business in New York in order to prepare for and finance its acquisition of Santander, those minimum contacts justify specific jurisdiction to order discovery from Santander not only as

to its New York activities, but the full scope of its activities related to the BPE resolution and acquisition.[5]

### 3. Principles of Fair Play and Substantial Justice Support Requiring Santander to Provide the Requested Discovery.

Finally, the exercise of personal jurisdiction to order Santander to produce the requested discovery "would comport with fair play and substantial justice." *Burger King*, 471 U.S. at 476. Where (as here) a litigant has purposefully directed suit-related activities at the forum, it will almost always be constitutionally permissible for a court to exercise specific jurisdiction, and the litigant challenging jurisdiction "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477; *see Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 575 (2d Cir. 1996) (noting that "dismissals resulting from the application of the reasonableness test should be few and far between"). In deciding whether specific jurisdiction is reasonable, courts may consider "the burden that the exercise of jurisdiction will impose on the defendant," "the interests of the forum state in adjudicating the case," and "the plaintiff's interest

---

[5] That should hardly be surprising, since the same rule applies in any civil action where the district court has specific jurisdiction over the defendant. In such cases, the district court has specific jurisdiction to order discovery against the defendant not only about the particular contacts between the defendant and the forum that give rise to jurisdiction, but also about "any nonprivileged matter that is relevant to any party's claim or defense," even if that matter itself has no other connection with the forum. Fed. R. Civ. P. 26(b)(1); *see Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003) (noting that discovery rules "are to be accorded a broad and liberal treatment").

in obtaining convenient and effective relief," along with any other relevant factors. *Licci*, 732 F.3d at 170 (quoting *Metro. Life*, 84 F.3d at 568).[6]

As applied here, those factors do not make this one of the "unusual" cases in which the exercise of specific jurisdiction can be deemed constitutionally unreasonable. *Metro. Life*, 84 F.3d at 575. In fact, the district court all but held as much in ordering discovery against Santander Investment Securities, Inc., specifically rejecting Santander's argument that "producing documents located abroad would be unduly burdensome and intrusive." SPA-17. As described above, the burden Santander faces from the discovery request here is categorically slighter here than the burden imposed in the liability context; Santander is not being asked to defend itself in a distant forum at the risk of civil liability for its past actions, but only to produce certain relevant documents for use in other proceedings. *See supra* pp.17–19, 37–38. In light of the "conveniences of modern communication and transportation," and the fact that Santander already maintains a substantial presence in New York in any event, the exercise of specific jurisdiction imposes no significant burden on Santander here.

---

[6] Two other commonly cited factors, "the interstate judicial system's interest in obtaining the most efficient resolution of controversies" and the "shared interest of the several States in furthering fundamental substantive social policies," are not relevant here. *Burger King*, 471 U.S. at 477 (quoting *World-Wide Volkswagen*, 444 U.S. at 292).

In any event, Santander's minimal burden in providing the requested discovery is easily outweighed by the significant federal interests in favor of exercising jurisdiction—namely, the twin goals that motivated Congress to enact §1782 in the first instance, in order to provide "equitable and efficacious discovery" in aid of foreign proceedings and to encourage other countries by example to do the same. *Brandi-Dohrn*, 673 F.3d at 80. As the district court recognized, Appellants have a weighty interest in obtaining the requested discovery in these proceedings, both because the documents sought are uniquely in Santander's possession and because those documents "are currently beyond the reach of the foreign tribunals." SPA-16–17. Considering these factors as a whole, and in conjunction with the numerous substantial contacts between Santander and New York (including those specifically related to the requested discovery), the exercise of specific jurisdiction over Santander cannot be said to offend fair play and substantial justice.

## CONCLUSION

This Court should reverse the decision below and remand for the district court to grant Appellants' applications for discovery under §1782.

Respectfully submitted,

s/Peter Evan Calamari

PETER EVAN CALAMARI
DAVID MADER
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for the PIMCO
and Anchorage Petitioners-Appellants*

s/Javier H. Rubinstein, P.C.

JAVIER H. RUBINSTEIN, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000

C. HARKER RHODES IV
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC 20005
(202) 879-5000

LAUREN F. FRIEDMAN
LUCILA I.M. HEMMINGSEN
JOSEPH MYER SANDERSON
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Attorneys for the del Valle Ruiz
Petitioners-Appellants*

December 3, 2018

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1(a)(4)(A) because it contains 13,854 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

December 3, 2018

s/Javier H. Rubinstein, P.C.
Javier H. Rubinstein, P.C.

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 3, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Javier H. Rubinstein, P.C.
Javier H. Rubinstein, P.C.

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Opinion and Order of the Honorable Edgardo Ramos Appealed From,
dated October 19, 2018 .......................................... SPA-1

Statute:

28 U.S.C. § 1782.................................................. SPA-19

# SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF ANTONIO DEL VALLE RUIZ AND OTHERS FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | **OPINION AND ORDER**<br><br>18 Misc. 85 (ER) |
| IN RE APPLICATION OF PACIFIC INVESTMENT MANAGEMENT COMPANY LLC AND ANCHORAGE CAPITAL GROUP, L.L.C. FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | 18 Misc. 127 (ER) |

Ramos, D.J.:

Petitioners in the above-captioned actions have applied for court orders to conduct discovery for use in foreign proceedings, pursuant to Title 28, United States Code, Section 1782. Petitioners in both actions seek discovery against Banco Santander, S.A., Santander Holdings U.S.A., Inc., and Santander Bank N.A (collectively, "Santander"). Petitioners in one of the actions also seek an order to conduct discovery against Santander Investment Securities Inc. For the reasons set forth below, Petitioners' applications are GRANTED in part and DENIED in part.

## I.   BACKGROUND

Banco Popular Español, S.A. was at one point Spain's sixth largest bank, with € 147 billion in assets. *See* Decl. of Javier H. Rubinstein in Support of Petition for 28 U.S.C. § 1782 Discovery ¶ 21 ("Rubinstein Decl."), Case No. 18 Misc. 85, Doc. 16.[1] On June 6, 2017, the European Central Bank, which comprises one part of Europe's system of banking supervision, informed the European Single Resolution Board, another part of Europe's system of banking

---

[1] Both sets of Petitioners allege similar (if not identical) facts, most of which are undisputed by Santander. Accordingly, the Court draws from the undisputed facts contained in the Rubenstein Declaration, which is offered in support of the application for discovery in Case No. 18 Misc. 85. All references to the Rubenstein Declaration incorporate the documents cited therein.

supervision, that Banco Popular was failing or likely to fail.  *See id.* ¶ 54.  On that same day, and at the direction of the Single Resolution Board, Spain's national banking supervisory authority, the Fondo de Reestructuración Ordenada Bancaria ("FROB"), invited several banks to submit offers to acquire Banco Popular.  *Id.*  Of the banks invited to submit a bid, Banco Santander, S.A. was the only bank to submit one.  *Id.* ¶ 56.  The next day, June 7, 2017, the Single Resolution Board and FROB accepted Santander's €1 offer and declared Santander the purchaser of Banco Popular.  *Id.* ¶ 59.  The government-ordered sale of Banco Popular was ostensibly done pursuant to a "resolution," a process in which the aforementioned authorities can force the total or partial disposal of a financial institution's assets when certain requirements are met.  *See id.* ¶¶ 46–50. Banco Popular was the first European Union financial institution ever to undergo a "resolution." *Id.* ¶ 5.

Petitioners in the instant actions are former investors in Banco Popular.  Petitioners allege that they lost virtually all of their investments when Santander purchased Banco Popular for €1. Petitioners in Case No. 18 Misc. 127—the "PIMCO Petitioners"—manage funds that held Banco Popular bonds.  Petitioners in Case No. 18 Misc. 85—the "Del Valle Ruiz Petitioners"— comprise a group of 55 former investors in Banco Popular.  Collectively, Petitioners claim to have lost over one billion euros because of the forced sale.

Following Santander's acquisition of Banco Popular, Petitioners initiated actions before the General Court of the Court of Justice of the European Union against the agencies responsible for Banco Popular's resolution.  In those actions, Petitioners seek to annul the resolution of Banco Popular, asserting that the resolution was illegal.  In addition, Del Valle Ruiz Petitioners initiated investor-state arbitration proceedings against Spain, pursuant to the Mexico-Spain Bilateral Investment Treaty.  Del Valle Ruiz Petitioners contend that the Spanish government

**SPA-3**

"actively participated in the design and decision-making process that ultimately led to the European Commission's and the Single Resolution Board's decision to resolve [Banco Popular]." *Id.* ¶ 2.  And PIMCO Petitioners, for their part, filed writs with the Spanish Central Criminal Court to join Spanish criminal proceedings against Banco Popular and its former management personnel.  Declaration of Peter Calamari ("Calamari Decl.") ¶¶ 47–48, Case No. 18 Misc. 127, Doc. 8.  Neither group of Petitioners have initiated foreign actions against Santander, however.

Pursuant to 28 U.S.C. § 1782, both groups of Petitioners apply for orders from this Court to conduct discovery against Santander for use in the foreign proceedings.  PIMCO Petitioners also seek discovery from Santander Investment Securities Inc.  Below, the Court analyzes Petitioners' applications.

## II.   ANALYSIS

Pursuant to Section 1782, "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation."  28 U.S.C. § 1782(a).  To obtain a court order for discovery under Section 1782, an applicant must establish the following:  "(1) that the person from whom discovery is sought reside[s] (or [can] be found) in the district of the district court to which the application is made, (2) that the discovery [is] for use in a proceeding before a foreign tribunal, and (3) that the application [is] made by a foreign or international tribunal or 'any interested person.'"  *In re Edelman*, 295 F.3d 171, 175–76 (2d Cir. 2002) (citation omitted).

"Once a district court is assured that it has jurisdiction over the petition, it *may* grant discovery under § 1782 *in its discretion*."  *Kiobel v. Cravath, Swaine & Moore LLP*, 895 F.3d

# SPA-4

238, 244 (2d Cir. 2018) (emphases added).  "To guide district courts in the decision to grant a Section 1782 petition, the Supreme Court in *Intel* [*Corp. v. Advanced Micro Devices, Inc.*], 542 U.S. 241 [(2004)], discussed non-exclusive factors . . . to be considered in light of the 'twin aims' of Section 1782:  'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'"  *Id.* (citation omitted).  The four *Intel* factors are as follows:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which case "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought form a nonparticipant in the matter arising abroad," given that "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence;"

> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;"

> (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and

> (4) whether the discovery request is "unduly intrusive or burdensome."

*Intel*, 542 U.S. at 264–65; *see also Kiobel*, 895 F.3d at 244 (quoting same).

In this case, Santander purports to challenge the propriety of court-ordered discovery pursuant to Section 1782 on both statutory and discretionary grounds.  At oral argument, however, Santander effectively conceded that Petitioners, at minimum, have satisfied the second and third statutory elements of Section 1782.  Accordingly, in the analysis below, the Court addresses the first statutory element only, ultimately finding a lack of authority to grant Petitioners' applications.

#### A. Applicable Legal Standard

To obtain a court order for discovery under Section 1782, an applicant must initially establish that the person from whom discovery is sought resides (or can be found) in the district where the application is made. *In re Edelman*, 295 F.3d at 175–76. Section 1782 does not define what it means to "reside" or be "found" in a particular district, and "[i]t is unclear whether [Section] 1782's statutory prerequisite that a person or entity reside or be found in a district is coextensive with whether a court has personal jurisdiction over that person or entity." *In re Sargeant*, 278 F. Supp. 3d 814, 820 (S.D.N.Y. 2017).[2] However, several courts within this District have recognized that, "[a]t minimum . . . compelling an entity to provide discovery under § 1782 must comport with constitutional due process." *Id.*; *accord, e.g.*, *In re Fornaciari*, No. 17 Misc. 521, 2018 WL 679884, at *2 (S.D.N.Y. Jan. 29, 2018); *Austl. & N.Z. Banking Grp. Ltd. v. APR Energy Holding Ltd.*, No. 17 Misc. 216 (VEC), 2017 WL 3841874, at *3 (S.D.N.Y. Sept. 1, 2017) ("Whether section 1782's requirement that the person be found or reside in the district equates to a requirement that the court have personal jurisdiction over the person in order to enforce a section 1782 subpoena is unclear. . . . Regardless of what section 1782 requires, the Constitution's due process protections apply."); *cf. Gucci Am., Inc. v. Li*, 768 F.3d 122, 141 (2d Cir. 2014) ("A district court . . . must have personal jurisdiction over a nonparty in order to compel it to comply with a valid discovery request under Federal Rule of Civil Procedure 45." (footnote omitted)).

---

[2] Three requirements must be satisfied before a federal court may lawfully exercise personal jurisdiction: (1) "the plaintiff's service of process upon the defendant must have been procedurally proper," (2) "there must be a statutory basis for personal jurisdiction that renders such service of process effective," and (3) "the exercise of personal jurisdiction must comport with constitutional due process principles." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59–60 (2d Cir. 2012).

# SPA-6

Given that constitutional due process principles apply to an applicant's request for discovery, it follows that district courts should employ the same analysis as when determining whether personal jurisdiction is present over a person.  Indeed, "Hans Smit, a leading academic commentator and drafter of [Section] 1782, has commented that the language defining [Section 1782's] in personam reach must be given a liberal construction commensurate with the purpose to liberalize the assistance given to foreign and international tribunals," and therefore, "[i]nsofar as the term 'found' applies to legal rather than natural persons, it may safely be regarded as referring to judicial precedents that equate systematic and continuous local activities with presence." *In re Sargeant*, 278 F. Supp. 3d at 819–20 (some internal quotation marks and alterations omitted) (quoting Hans Smit*, American Assistance to Litigation in Foreign and International Tribunals:  Section 1782 of Title 28 of the U.S.C. Revisited*, 25 Syracuse J. Int'l L. & Com. 1, 9–10 (1998)); *accord In re Godfrey*, 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007) (quoting same).  Put differently, a court may issue a discovery order against a person pursuant to Section 1782 only if "the relationship of the person addressed to the district is such as to warrant the exercise of in personam authority under the due process clause." *In re Sargeant*, 278 F. Supp. 3d at 820 (citation omitted); *see also In re Thai-Lao Lignite (Thai.) Co.,* 21 F. Supp. 2d 289, 294 n.4 (D.D.C. 2011) (concluding that the question whether a particular district is one "in which a person resides or is found" and the question whether the district court has personal jurisdiction over the person from whom discovery is sought are two questions that, "[a]t minimum, . . . overlap considerably").

1. ***General Jurisdiction over Santander***

In analyzing personal jurisdiction, the Supreme Court has long distinguished between "specific or case-linked jurisdiction and general or all-purpose jurisdiction."[3] *BNSF Ry. Co. v. Tyrell*, 137 S. Ct. 1549, 1558 (2017).  In *Daimler AG v. Bauman*, however, the Supreme Court cast doubt upon prior decisions in which it upheld the exercise of general personal jurisdiction based merely upon a corporation "doing business" or having a local office within a particular forum, 571 U.S. 117, 138 n.18 (2014), and instead clarified that, with respect to foreign corporations (i.e., "legal" persons), the touchstone of general personal jurisdiction is "whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum,'" *id.* at 138–39 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  The Supreme Court explained that a corporation's place of incorporation and principal place of business are "paradig[m] . . . bases for general jurisdiction."  *Id.* at 137 (alterations in original).  Moreover, while the Court cautioned that it was not "foreclos[ing] the possibility that in an *exceptional case* . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in the State," *id.* at 139 n.19 (emphasis added), notably, the only example of an "exceptional case" cited by the Court was *Perkins v. Benguet Consolidation Mining Co.*, 342 U.S. 437, 448 (1952).  In that case, the Supreme Court found that an Ohio state court could exercise general personal jurisdiction over a Filipino corporation on a claim that neither arose in Ohio nor related to the corporation's activities in Ohio because the corporation was forced to move its operations to Ohio during

---

[3] In general, "all-purpose jurisdiction permits a court to hear 'any and all claims' against an entity.  Specific jurisdiction, on the other hand, permits adjudicatory authority only over issues that 'aris[e] out of or relat[e] to the [entity's] contacts with the forum.'"  *Gucci Am., Inc. v. Li*, 768 F.3d 134 (2d Cir. 2014) (alterations in original) (citations omitted).

World War II and, consequently, "Ohio was the corporation's *principal*, if temporary, place of business," *Daimler AG*, 571 U.S. at 130 (emphasis added) (citation omitted).

Examples of the strict limits of general personal jurisdiction following *Daimler* abound. In *BNSF Railway*, for instance, the Supreme Court concluded that a railway company's extensive business activities in Montana were insufficient to subject that company to claims in Montana state courts unrelated to the company's business activities in the state. 137 S. Ct. at 1559. Notably, at the time of suit the company "ha[d] over 2,000 miles of railroad track and more than 2,000 employees in Montana." *Id.* Nevertheless, the Supreme Court held that these contacts were insufficient to support general personal jurisdiction, reiterating its remark in *Daimler* that "the general jurisdiction inquiry does not focus solely on the *magnitude* of the defendant's in-state contacts." *Id.* (emphasis added) (quoting *Daimler*, 571 U.S. at 140 n. 20). "Rather, the inquiry calls for an appraisal of a corporation's activities *in their entirety*; a corporation that operates in many places can scarcely be deemed *at home* in all of them." *Id.* (emphasis added) (internal quotation marks and alterations omitted) (quoting *Daimler*, 571 U.S. at 140 n. 20).

Moreover, the Second Circuit held recently that a court within this District erred when it exercised general personal jurisdiction over the Bank of China. *See Gucci Am.*, 768 F.3d at 122. In so holding, the Second Circuit noted that the bank's contacts with the United States— including two bank branches in New York—were insufficient to establish general personal jurisdiction:

> Just like the defendant in *Daimler*, the nonparty Bank here has branch offices in the forum, but is incorporated and headquartered elsewhere. Further, this is clearly not "an exceptional case" where the Bank's contacts are "so continuous and systematic as to render [it] essentially at home in the forum."

*Id.* at 135 (quoting *Daimler*, 571 U.S. at 138 & n.19). The Second Circuit in *Gucci America* acknowledged that its holding stood in sharp contrast with prior Circuit precedent, stating that

"[p]rior to *Daimler*, controlling precedent in this Circuit made it clear that a foreign bank with a branch in New York was properly subject to general personal jurisdiction here." *Id.* at 136.

Courts within this District mostly have followed *Daimler* and *Gucci America*'s reasoning in subsequent Section 1782 cases.  For example, in *Fornaciari*, the court concluded it lacked authority to grant a Section 1782 application against Royal Bank of Canada, noting, "[T]o the extent that [the applicant] premises general jurisdiction on the mere existence of Royal Bank's offices in this District, such argument is foreclosed by *Daimler AG v. Bauman*."  2018 WL 679884, at *2.  In *Sargeant*, the court concluded it lacked authority to enforce a Section 1782 order against a foreign company with one of its so-called "primary business offices" in New York City.  278 F. Supp. 3d at 821.  In so doing, the court noted that "the mere fact that [the company] maintains an office in New York City . . . from which it conducts business does not establish that its principal place of business is its midtown Manhattan location.  Nor is the bare allegation that [the company] conducts business in New York sufficient to establish that its operations in that offices are 'so substantial and of such a nature' as to render [the company] at home in New York." *Id.* (quoting *Gucci Am.*, 768 F.3d at 135–36).

Moreover, another court in this District concluded recently that it lacked authority over a foreign bank because New York was neither the bank's state of incorporation nor the bank's principal place of business, and there were no "exceptional circumstances" that would otherwise support general jurisdiction.  *Austl. & N.Z. Banking Grp.*, 2017 WL 3841874, at *3–4 (citing *Gucci Am.*, 768 F.3d at 135, 141); *see also In re Masters*, 315 F. Supp. 3d 269, 277 (D.D.C. 2018) (concluding that neither Bank of America, N.A., nor Citibank, N.A., was "found" in the District of Columbia—notwithstanding that the banks collectively maintained at least eighteen retail branches in the district and offered private banking and brokerage services—because the

banks were not incorporated therein and their respective principal places of business were elsewhere); *cf. Motorola Credit Corp. v. Uzan*, 132 F. Supp. 3d 518 (S.D.N.Y. 2015) (finding general personal jurisdiction improper in discovery dispute against three banks incorporated and principally based elsewhere, and noting that "*Gucci* stands for the proposition that mere operation of a branch office in a forum—and satisfaction of any attendant licensing requirements—is not constitutionally sufficient to establish general jurisdiction").

Given the aforementioned authorities, the Court must rely on *Daimler* and *Gucci* in evaluating the instant case.[4]  Here, Petitioners contend that Santander is "found" in the District because it has a "longstanding and significant presence in this District" and has "made New York a focal point for [their] investors."  Del Valle Ruiz Pet'rs' Mem. at 13–14; *accord* PIMCO Pet'rs' Mem. at 18 ("Santander has a longstanding and significant presence in this district.").  However, even assuming *arguendo* that Santander's business activities in the District are as extensive as Petitioners claim, Santander's activities remain insufficient to satisfy Section 1782.

Petitioners concede that Santander is incorporated and has its principal place of business outside of New York.  Nevertheless, Petitioners argue that Santander is "found" in the District based on the Defendants' level of activities within the District and the State of New York generally.  In total, Petitioners allege the following facts in support of their argument:

- Santander maintains branches in New York City, is supervised by the New York State Department of Financial Services, and manages $14.8 billion in assets here as of 2013;

---

[4] The Court notes one distinguishing fact between the instant case and *Daimler*:  In the latter case, the entity resisting personal jurisdiction was faced with the threat of liability, not just the burden of having to comply with a discovery request, as is the case here.  Prior to *Daimler*, the Second Circuit, in passing, has observed that "a person who is subjected to *liability* by service of process far from home may have better cause to complain of an outrage to fair play than one similarly situated who is merely called upon to supply documents or testimony."  *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 20 (2d Cir. 1998).  However, in the subsequent decades since that observation, neither the Supreme Court nor the Second Circuit (nor any other Circuit that the Court is aware of) has held that fewer contacts with a forum may be sufficient to exercise personal jurisdiction over an entity who faces the threat of discovery as a nonparty rather than liability as a party-defendant.  Accordingly, the Court will not so find here.

- Santander manages its wholly owned U.S. subsidiaries from New York City;
- Santander constitutes the ninth largest "banking group" by deposit market share in the New York area;
- Santander is listed on the New York Stock Exchange;
- The C.E.O. of Santander recently rang the bell of the New York Stock Exchange to celebrate the 30-year anniversary of Santander's listing on the Exchange;
- Santander executives holds some of their meetings in New York;
- Santander has certified and listed its New York City branch as "Process Agent" in certain filings;
- In previous S.D.N.Y. actions, Santander has admitted that it "maintain[s] offices and conduct[s] business in this district"; and
- One of Santander's chief executives, Scott Powell, lists his location on LinkedIn as New York City and is a board member for at last two New York-based non-profits.

See PIMCO Pet'rs' Mem. at 17–23; Del Valle Ruiz Pet'rs' Mem. at 13–16.  Nevertheless, in light of the aforementioned authorities, such contacts with this District are not enough.  Surely, if 2,061 miles of railroad track and 2,100 employees in Montana were not contacts that were "systematic and continuous" enough to make a railway company essentially "at home" in Montana, see BNSF Ry., 137 S. Ct. at 1554, and the Bank of China's multiple branches in Manhattan were not enough to render it essentially "at home" in this District, Gucci Am., 768 F.3d at 135, then Santander's New York offices, activities, and chief executive's LinkedIn profile are not enough contacts to render Santander essentially "at home" in this District.  Nor can it be said that the Santander's contacts with the District are so systematic and continuous that this case is "exceptional" like Perkins.  Unlike Perkins, a case in which the state of Ohio was a Filipino corporation's "principal, if temporary, place of business," Daimler AG, 571 U.S. at 130 (emphasis added) (citation omitted), Petitioners in this case have never suggested that Santander's principal place of business is within the District.  At bottom, Santander's contacts with this District are far less systematic and continuous than corporations that have been spared from general personal jurisdiction in other binding authorities.

11

However, notwithstanding the voluminous case law against their position, Petitioners rely on a few cases that ostensibly support their conclusion that Santander is "found" in this District. None is persuasive.  First, Petitioners point to *In re Kleimar N.V.*, 220 F. Supp. 3d 517, 521 (S.D.N.Y. 2016), a case in which the court concluded that a Brazilian multinational mining corporation was "found" in the District because the corporation trades on the New York Stock Exchange, regularly files forms with the Securities and Exchange Commission, and its subsidiary corporation "appears to conduct systematic and regular business in the United States and New York."  *Id.*  The *Kleimar* court, however, was never asked to grapple with the Supreme Court's view of general personal jurisdiction in light of *Daimler* or *BNSF Railway* or the Second Circuit's opinion in *Gucci America*, and thus never attempted to distinguish the myriad Second Circuit and district court opinions that reached opposite conclusions with similar levels of business activity.  *See, e.g.*, *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 641 (2d Cir. 2016) (declining to read Connecticut's business registration and agent-appointment statute as "embodying actual consent by every registered corporation to the state's exercise of general jurisdiction over it" in light of due process and other constitutional concerns); *Motorola Credit Corp.*, 132 F. Supp. 3d at 518 (concluding that foreign banks were not subject to discovery under Section 1782 in this District notwithstanding that the banks maintain branches in New York City and are registered and licensed under New York banking laws and federal laws).

The Court is similarly unpersuaded by Petitioners' reliance on *In re Alghanim*, No. 17 Misc. 406 (PKC), Doc. 7 (S.D.N.Y. Nov. 16, 2017), which Petitioners cite as an example of a court "authoriz[ing] discovery of Santander in another section 1782 proceeding."  Del Valle Ruiz Pet'rs' Mem. at 13.  However, the record in *Alghanim* makes clear that the court issued the discovery order *ex parte*.  Moreover, the record further reveals that Santander *voluntarily* turned

12

over discovery instead of moving to quash the applicant's subpoena.  *See In re Alghanim*, No. 17

Misc. 406 (PKC), 2018 WL 2356660, at *2 (S.D.N.Y. May 9, 2018).  Accordingly, given that

Santander neither intervened in that proceeding nor moved to quash the subpoena, the *Alghanim*

court had no occasion to determine whether Santander was "found" in the District for purposes

of Section 1782.  *Cf. Masters*, 315 F. Supp. 3d at 272 ("[D]istrict courts are generally authorized

to review a § 1782 application on an *ex parte* basis, and . . . as a general matter, *ex parte* review

is justified by the fact that the parties from whom discovery is sought will be given adequate

notice of any discovery taken pursuant to the request and will then have the opportunity to move

to quash the discovery or to participate in it.").

Petitioners also cite to *Ayyash v. Crowe Horwath LLP*, in which the court concluded that

two foreign accounting firms were "found" in the District because it maintained offices here.

No. 17 Misc. 482, 2018 WL 1871087, at *2 (S.D.N.Y. Apr. 17, 2018).  However, like *Kleimar*,

the court in *Ayyash* was not asked to analyze jurisdiction in light of *Daimler* and *Gucci America*,

and thus concluded that two foreign companies were "found" in the District merely because they

have offices here.  *Id.*  And, like the respondents in *Alghanim*, the *Ayyash* respondents never

contested that they were "found" here.  *Id.*  Consequently, the Court finds Petitioners' reliance on

this case unavailing.[5]

---

[5] Petitioners also cite to several out-of-district cases in which courts have found personal jurisdiction over corporate entities proper based solely on the presence of a company's office or business activities in the district.  *See, e.g., In re Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1036 (N.D. Cal. 2016).  But all of those cases either predate *Daimler, see, e.g., In re Inversiones y Gasolinera Petroleos Vanezuela, S. de R.L.*, 2011 WL 181311, at *7–8 (S.D. Fla. Jan. 19, 2011), or the courts did not consider whether constitutional due process was satisfied before exercising jurisdiction, *see, e.g., Qualcomm Inc.*, 162 F. Supp. 3d at 1036.

2.     *Specific Jurisdiction over Santander*

Petitioners, in a final effort, make what can only be described as an argument for the exercise of *specific* personal jurisdiction.  Even without general personal jurisdiction, the Court may obtain specific personal jurisdiction over Santander.  *See Gucci Am.*, 768 F.3d at 136.  As the Second Circuit noted in *Gucci America*, courts undertake a two-step analysis to ascertain specific personal jurisdiction:  "First, the court must decide if the defendant has purposely directed his activities at the forum and the litigation arises out of or relates to those activities." *Id.* (internal quotation marks and alterations omitted).  "Second, once the court has established these minimum contacts, it determines whether the assertion of personal jurisdiction would comport with fair play and substantial justice."  *Id.* (internal quotation marks and alterations omitted) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

Here, Petitioners argue that jurisdiction is proper because some of Santander's activities in the District relate to the subject matter of the discovery they seek.  In support of this argument, Petitioners claim that (1) Santander executives met with analysts and investors in New York City in the days following the "resolution" and subsequent acquisition of Banco Popular to raise capital needed to help facilitate the acquisition; (2) Santander's private counsel wrote letters to the Securities and Exchange Commission to request exemptive relief from certain securities law requirements concomitant with the acquisition of Banco Popular; and (3) Santander allegedly retained investment banks in New York, prior to the sale of Banco Popular, to explore financing options for its acquisition.  *See, e.g.*, Del Valle Ruiz Pet'rs' Mem.  at 15–16; PIMCO Pet'rs' Mem. at 21–23.

The Court finds none of these alleged activities sufficient to exercise specific personal jurisdiction.  With respect to specific jurisdiction over a *nonparty*, as is the case here, generally

courts in this District "first assess the connection between the nonparty's contacts with the forum

and the [discovery] order at issue, and then decide whether exercising jurisdiction for the

purposes of the order would comport with fair play ad substantial justice." *Gucci Am.*, 768 F.3d

at 137.  As Santander points out, however, in this case all of Santander's alleged New York

activities took place "*after* the Resolution had already been adopted," and thus, the activities

"shed[] no light on the regulators' decision to effect the Resolution"—the specific focus of all of

Petitioners' foreign proceedings.  Santander's Mem. at 14–15.  *See, e.g.*, Rubinstein Decl. Exs.

1–2 (applications for litigation against the Single Resolution Board, the European Commission,

and Spain involving decisions leading up to and including the Resolution and resultant sale of

Banco Popular); Calamari Decl. ¶¶ 43–49 (detailing same).  Accordingly, the litigation abroad

cannot be said to arise out of or relate to Santander's activities in the forum.

* * * *

The overwhelming majority of courts that have wrestled with the evolving interpretation

of Section 1782 have concluded that, at the very least, a corporation is not "found" in a district

merely because it maintains offices or conducts business in the district.  The Court agrees with

this view.  The threshold inquiry to establish jurisdiction "is *not* whether a foreign corporation's

in-forum contacts can be said to be in some sense continuous and systematic, it is whether that

corporation's affiliations with the State are *so continuous and systematic* as to render it

essentially *at home* in the forum State."  *Daimler*, 571 U.S. at 138–39 (emphases added) (internal

quotation marks and alterations omitted); *see also Lockheed Martin Corp.*, 814 F.3d at 629

("When a corporation is neither incorporated nor maintains its principal place of business in a

state, mere contacts, no matter how 'systematic and continuous,' are *extraordinarily unlikely* to

add up to an 'exceptional case.'").  Here, Petitioners have failed to establish that Santander

conducts anything other than some level of systematic and continuous business in its offices in the District.  This is insufficient to satisfy personal jurisdiction here.

### B.  Discovery from Santander Investment Securities Inc.

PIMCO Petitioners also seek discovery from Santander Investment Securities Inc. (hereinafter, "SIS").  Santander concedes that SIS maintains its principal place of business within the District.  *See* PIMCO Pet'rs' Mem. at 5.  Consequently, the Court finds that constitutional due process principles and Section 1782's "resides or is found" requirement are satisfied as to SIS.  Moreover, at oral argument, Santander conceded, and the Court is independently satisfied, that Petitioners have established Section 1782's other statutory requirements—i.e., that the discovery sought is for use in a proceeding before a foreign tribunal, and that the application for discovery was made by interested persons.  *See* 28 U.S.C. § 1782(a).  Therefore, the Court concludes that it has statutory authority to grant discovery from SIS.

The Court also finds that discovery against SIS is appropriate.  In so finding, the Court has considered the "twin aims" of Section 1782:  providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.  *Kiobel*, 895 F.3d at 244.  The Court is satisfied that, based on the circumstances present in this case and consideration of *Intel*'s discretionary factors, both aims are furthered by this decision.

First, the Court credits Petitioners' arguments that the documents they seek are currently beyond the reach of the foreign tribunals.  While Santander has been ordered to produce documents in at least one foreign proceeding, *see* PIMCO Pet'rs' Reply at 7 (noting that the Spanish Central Criminal Court has ordered Santander to produce certain documents), Santander

is not a party in any of the foreign proceedings.[6]  Nor is Santander an especially *active* participant in the criminal proceeding in which it has produced documents.  *See* Santander's July 19, 2018 Letter to the Court, Case No. 18 Misc. 127, Doc. 52 (stating that it has produced only twelve documents related to the Spanish Central Criminal Court's order to produce documents).  This fact generally weighs in favor of granting Petitioners Section 1782 aid.

Second, insofar as Santander argues that this Court cannot compel it to produce documents located abroad, or that producing documents located abroad would be unduly burdensome and intrusive, the Court disagrees.  *See In re Delight Int'l Ltd.*, 16 Misc. 125 (JMF), 2018 WL 2849724, at *4 (S.D.N.Y. June 11, 2018) (surveying case law on the question whether Section 1782 authorizes discovery of documents outside the United States and concluding that "the Eleventh Circuit and the district judges who have held that Section 1782 can reach documents abroad have the better of the argument" in light of the plain language of the statute and legislative history).  Accordingly, PIMCO Petitioners' application will be granted as to SIS.

## III.   CONCLUSION

---

[6] The Court notes that Santander has pending motions to intervene in most, if not all, of the foreign proceedings, but they have not yet been granted.

# SPA-18

For the reasons stated above, Del Valle Ruiz Petitioners' application for an Order to conduct discovery against Santander for use in foreign proceedings is DENIED.  PIMCO Petitioners' application for an Order to conduct discovery is DENIED insofar as it requests discovery from Santander, and GRANTED insofar as it requests discovery from SIS.

The Clerk of Court is respectfully directed to terminate the open motion in Case No. 18 Misc. 85, Doc. 1, and to close that case.  The Clerk of Court is further directed to terminate the open motions in Case No. 18 Misc. 127, Docs. 1, 9.

It is SO ORDERED.

Dated:        October 19, 2018
              New York, New York


                                        Edgardo Ramos, U.S.D.J.

### AMENDMENTS

1964—Pub. L. 88–619 substituted provisions authorizing the Department of State to transmit a letter rogatory or request by a foreign or international tribunal, or by a tribunal in the United States, to the tribunal, officer or agency in the United States or its foreign or international counterpart, to whom addressed, and to return it after execution, and providing that this section does not preclude direct transmission of letters rogatory or requests between interested tribunals, officers or agencies of foreign, international and of United States origin, for provisions authorizing United States ministers or consuls, whenever a United States court issues letters rogatory or a commission to take a deposition, to receive the executed letters or commissions from foreign courts or officers, endorse them with the place and date of receipt and any change in the deposition, and transmit it to the clerk of the issuing court in the same manner as his official dispatches, in text and ''Transmittal of letter rogatory or request'' for ''Foreign witnesses'' in section catchline.

## § 1782. Assistance to foreign and international tribunals and to litigants before such tribunals

(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

(b) This chapter does not preclude a person within the United States from voluntarily giving his testimony or statement, or producing a document or other thing, for use in a proceeding in a foreign or international tribunal before any person and in any manner acceptable to him.

(June 25, 1948, ch. 646, 62 Stat. 949; May 24, 1949, ch. 139, § 93, 63 Stat. 103; Pub. L. 88–619, § 9(a), Oct. 3, 1964, 78 Stat. 997; Pub. L. 104–106, div. A, title XIII, § 1342(b), Feb. 10, 1996, 110 Stat. 486.)

### HISTORICAL AND REVISION NOTES

#### 1948 ACT

Based on title 28, U.S.C., 1940 ed., §§649–653, 701, 703, 704 (R.S. §§871–875, 4071, 4073, 4074; Feb. 27, 1877, ch. 69, §1, 19 Stat. 241; Mar. 3, 1911, ch. 231, §291, 36 Stat. 1167; June 25, 1936, ch. 804, 49 Stat. 1921).

Sections 649–652 of title 28, U.S.C., 1940 ed., applied only to the District of Columbia and contained detailed provisions for issuing subpoenas, payment of witness fees and procedure for ordering and taking depositions. These matters are all covered by Federal Rules of Civil Procedure, Rules 26–32.

Provisions in sections 649–652 of title 28, U.S.C., 1940 ed., relating to the taking of testimony in the District of Columbia for use in State and Territorial courts were omitted as covered by section 14–204 of the District of Columbia Code, 1940 ed., and Rules 26 et seq., and 46 of the Federal Rules of Civil Procedure.

Only the last sentence of section 653 of title 28, U.S.C., 1940 ed., is included in this revised section. The remaining provisions relating to depositions of witnesses in foreign countries form the basis of section 1781 of this title.

Sections 701, 703, and 704 of title 28, U.S.C., 1940 ed., were limited to ''suits for the recovery of money or property depending in any court in any foreign country with which the United States are at peace, and in which the government of such foreign country shall be a party or shall have an interest.''

The revised section omits this limitation in view of the general application of the last sentence of section 653 of title 28, U.S.C., 1940 ed., consolidated herein. The improvement of communications and the expected growth of foreign commerce will inevitably increase litigation involving witnesses separated by wide distances.

Therefore the revised section is made simple and clear to provide a flexible procedure for the taking of depositions. The ample safeguards of the Federal Rules of Civil Procedure, Rules 26–32, will prevent misuse of this section.

The provisions of section 703 of title 28, U.S.C., 1940 ed., for punishment of disobedience to subpoena or refusal to answer is covered by Rule 37(b)(1) of Federal Rules or Civil Procedure.

The provisions of section 704 of title 28, U.S.C., 1940 ed., with respect to fees and mileage of witnesses are covered by Rule 45(c) of Federal Rules of Civil Procedure.

Changes were made in phraseology.

#### 1949 ACT

This amendment corrects restrictive language in section 1782 of title 28, U.S.C., in conformity with original law and permits depositions in any judicial proceeding without regard to whether the deponent is ''residing'' in the district or only sojourning there.

### REFERENCES IN TEXT

The Federal Rules of Civil Procedure, referred to in subsec. (a), are set out in the Appendix to this title.

### AMENDMENTS

1996—Subsec. (a). Pub. L. 104–106 inserted '', including criminal investigations conducted before formal accusation'' after ''proceeding in a foreign or international tribunal'' in first sentence.

1964—Pub. L. 88–619 substituted provisions which empowered district courts to order residents to give testimony or to produce documents for use in a foreign or international tribunal, pursuant to a letter rogatory, or request, of a foreign or international tribunal or upon application of any interested person, and to direct that the evidence be presented before a person appointed by the court, provided that such person may administer oaths and take testimony, that the evidence be taken in accordance with the Federal Rules of Civil Procedure unless the order prescribes using the procedure of the foreign or international tribunal, that a person may not be compelled to give legally privileged evidence, and that this chapter doesn't preclude a person from voluntarily giving evidence for use in a foreign or international tribunal, for provisions permitting depositions of witnesses within the United States for use in any court in a foreign country with which the

United States was at peace to be taken before a person authorized to administer oaths designated by the district court of the district where the witness resides or is found, and directing that the procedure used be that generally used in courts of the United States, in text, and ''Assistance to foreign and international tribunals and to litigants before such tribunals'' for ''Testimony for use in foreign courts'' in section catchline.

1949—Act May 24, 1949, struck out ''residing'' after ''witness'', and substituted ''judicial proceeding'' for ''civil action'' after ''to be used in any''.

## § 1783. Subpoena of person in foreign country

(a) A court of the United States may order the issuance of a subpoena requiring the appearance as a witness before it, or before a person or body designated by it, of a national or resident of the United States who is in a foreign country, or requiring the production of a specified document or other thing by him, if the court finds that particular testimony or the production of the document or other thing by him is necessary in the interest of justice, and, in other than a criminal action or proceeding, if the court finds, in addition, that it is not possible to obtain his testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in any other manner.

(b) The subpoena shall designate the time and place for the appearance or for the production of the document or other thing. Service of the subpoena and any order to show cause, rule, judgment, or decree authorized by this section or by section 1784 of this title shall be effected in accordance with the provisions of the Federal Rules of Civil Procedure relating to service of process on a person in a foreign country. The person serving the subpoena shall tender to the person to whom the subpoena is addressed his estimated necessary travel and attendance expenses, the amount of which shall be determined by the court and stated in the order directing the issuance of the subpoena.

(June 25, 1948, ch. 646, 62 Stat. 949; Pub. L. 88–619, § 10(a), Oct. 3, 1964, 78 Stat. 997.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§ 711, 712, and 713 (July 3, 1926, ch. 762, §§ 1–3, 44 Stat. 835).

Word ''resident'' was substituted for ''or domiciled therein.'' (See reviser's note under section 1391 of this title.)

Words ''or any assistant or district attorney acting under him,'' after ''Attorney General'' in section 712 of title 28, U.S.C., 1940 ed., were omitted, since, in any event, the approval of the Attorney General would be required. (See section 507 of this title.)

Changes were made in phraseology.

REFERENCES IN TEXT

The Federal Rules of Civil Procedure, referred to in subsec. (b), are set out in the Appendix to this title.

AMENDMENTS

1964—Pub. L. 88–619 amended section generally, and, among other changes, authorized a United States court to issue a subpoena to require the appearance of a witness before it or a person or body designated by it, and the production of documents or other tangible evidence, when necessary in the interest of justice, and in other than criminal actions or proceedings, if the court finds, in addition, that its not possible to obtain admissible evidence in any other manner, and provided that

the procedure relating to the subpoena shall be in accordance with the Federal Rules of Civil Procedure, and struck out provisions which authorized the issuance of a subpoena when a personally notified individual failed to appear to testify pursuant to letter rogatory, or failed to answer any question he would have to answer in any examination before the court or if such person was beyond United States jurisdiction and the testimony was desired by the Attorney General in a criminal proceeding, provided that the subpoena issue to any United States consul, that the consul make personal service of the subpoena and of any order, rule, judgment or decree, that he make return of the subpoena and tender expenses to the witness, and substituted ''person'' for ''witness'' in section catchline.

## § 1784. Contempt

(a) The court of the United States which has issued a subpoena served in a foreign country may order the person who has failed to appear or who has failed to produce a document or other thing as directed therein to show cause before it at a designated time why he should not be punished for contempt.

(b) The court, in the order to show cause, may direct that any of the person's property within the United States be levied upon or seized, in the manner provided by law or court rules governing levy or seizure under execution, and held to satisfy any judgment that may be rendered against him pursuant to subsection (d) of this section if adequate security, in such amount as the court may direct in the order, be given for any damage that he might suffer should he not be found in contempt. Security under this subsection may not be required of the United States.

(c) A copy of the order to show cause shall be served on the person in accordance with section 1783(b) of this title.

(d) On the return day of the order to show cause or any later day to which the hearing may be continued, proof shall be taken. If the person is found in contempt, the court, notwithstanding any limitation upon its power generally to punish for contempt, may fine him not more than $100,000 and direct that the fine and costs of the proceedings be satisfied by a sale of the property levied upon or seized, conducted upon the notice required and in the manner provided for sales upon execution.

(June 25, 1948, ch. 646, 62 Stat. 949; Pub. L. 88–619, § 11, Oct. 3, 1964, 78 Stat. 998.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§ 714, 715, 716, 717, and 718 (July 3, 1926, ch. 762, §§ 4–8, 44 Stat. 836).

Sections 714–718 of title 28, U.S.C., 1940 ed., were consolidated, since all relate to contempt by a witness served personally in a foreign country.

The last sentence omits specific reference to section 118 of title 28, U.S.C., 1940 ed., now incorporated in section 1655 of this title, which provides for the method of opening judgments rendered on publication of process. (See also Rule 60(b) of the Federal Rules of Civil Procedure.)

Changes were made in phraseology.

AMENDMENTS

1964—Pub. L. 88–619 amended section generally, and, among other changes, authorized the court to order a person to show cause for failing to produce a document or other thing in subsec. (a), provided that a copy of the order to show cause shall be served in accordance